No. 66,097

IN THE MATTER OF THE APPEAL OF FEDERAL DEPOSIT INSURANCE
CORPORATION FROM AN ORDER OF THE DIRECTOR OF TAXATION
ON ASSESSMENT OF PRIVILEGE TAX FOR FARMERS AND MER-
CHANTS STATE BANK OF RUSH COUNTY, KANSAS.

(822 P.2d 627)

Opinion filed December 6, 1991.

*W. Dennis Cross*, of Morrison & Hecker, of Kansas City, Missouri, argued the cause, and *Ben W. Hobert*, of the same firm, and *George F. Crawford*, of the same firm, of Overland Park, were with him on the briefs for appellant FDIC.

*David Prager, III*, of Legal Services Bureau, argued the cause, and *Mark A. Burghart*, general counsel, was with him on the brief for appellee Kansas Department of Revenue.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal by the Federal Deposit Insurance Corporation (FDIC) from an order of the Board of Tax Appeals (BOTA) affirming the decision of the Director of Taxation (Director) of the Kansas Department of Revenue (Department) denying FDIC's claim for a refund of privilege taxes based upon a redetermination of the Farmers and Merchants State Bank's (Bank) taxable income for the years 1975 through 1984 by carrying back its 1985 net operating loss (NOL). The Department denied

the refund because FDIC's appointment as receiver for the Bank terminated the Bank's obligation to file a privilege tax return in 1986. This case was transferred from the Court of Appeals pursuant to K.S.A. 20-3017.

The issue raised in this appeal is whether the Kansas privilege tax statutes, K.S.A. 79-1106 *et seq.* (Ensley 1984), allow a loss that was incurred the year the Bank ceased operation to be carried back and taken into account in determining the taxable income of prior years.

The facts were stipulated to by the parties. The Bank was organized and chartered under the laws of Kansas in 1898. It operated as a commercial bank until November 21, 1985, when the banking commission appointed FDIC as the Bank's receiver. From 1975 through 1984, the Bank reported taxable income, which was the basis for its payment of privilege taxes in an aggregate amount of $204,203. Each year, the privilege tax is based on the taxable income of the previous year in conformity with federal taxable income adjusted in accordance with the provisions of K.S.A. 79-1109 (Ensley 1984).

In 1985, the Bank had a NOL in the amount of $5,015,524, incurring $4,284,151 prior to FDIC's appointment as receiver on November 21, 1985, and while the Bank continued to conduct full-scale commercial banking operations. All losses arose from Kansas activity. After the receiver was appointed, the Bank and its receiver could not receive deposits, K.S.A. 9-2010 and K.S.A. 17-6106(a), or do business, K.S.A. 9-702. FDIC conducted only liquidation activities, maintaining an office at the Bank's former location in LaCrosse, Kansas, until August 15, 1986, when the office was moved to Wichita. FDIC did not receive any deposits or make new loans.

Under federal income tax law, FDIC was entitled to carry back the loss incurred by the Bank in 1985 to the years 1975 through 1984 by redetermining its taxable income for those years in obtaining a refund of income taxes paid. I.R.C. § 172(b)(1)(F) (1984). The Internal Revenue Service (IRS) paid those refunds to FDIC, which deposited them in the Bank's receivership account. After the IRS's redetermination of the Bank's taxable income for 1975 through 1984, FDIC, as receiver for the Bank, made a timely claim for refund of the Kansas privilege taxes.

On other occasions, the Department has recognized the right of banks and other taxpayers to redetermine taxable income for privilege tax purposes based on carryback of NOL in conformity with federal income tax laws. In a similar case, the Department in 1981 refunded privilege taxes to FDIC as receiver for Mission State Bank, based on a carryback of losses sustained by operations in the year FDIC was appointed as receiver. But here, the Department denied FDIC's privilege tax refund, holding:

"Taxpayer ceased its business operation on November 21, 1985,· and hence did not exercise the privilege of doing business in 1986 for which the subject tax is levied. State law effectively prevented the Taxpayer from conducting its business activities after November 21, 1985 (See K.S.A. 9-2010, 17-6106[a], and 9-702)."

The Department denied FDIC's privilege tax refund because no privilege tax return was required for any year that began after the appointment of the receiver, and therefore the loss sustained by the Bank in 1985 could not be carried back to redetermine its privilege tax liability for earlier years. The Director and BOTA upheld this decision.

FDIC argues that Kansas statutes entitle it to distribute the enormous financial loss the Bank experienced in 1985 by deducting its 1985 NOL through redetermination of income on the tax returns for the years 1975 through 1984. As support, FDIC notes that K.S.A. 79-1107 (Ensley 1984) required the Bank to "pay to the state for the privilege of doing business within the state a tax according to or measured by its net income for the next preceding calendar . . . year to be computed as provided in this act." In K.S.A. 79-1109 (Ensley 1984), the term "net income" is defined as "the Kansas taxable income of corporations as defined in K.S.A. 79-32,138" with additions and subtractions as listed in that section. K.S.A. 79-32,138(a) (Ensley 1984) states: "Kansas taxable income of a corporation taxable under this act shall be the corporation's federal taxable income for the taxable year with the modifications specified in this section." This section then lists certain items that must be added or subtracted to the federal taxable income to determine the Kansas taxable income.

During the years at issue here, K.S.A. 79-32,143(a) (Ensley 1984) allowed a NOL deduction in the same manner as the Internal Revenue Code, and provided as follows:

"A net operating loss deduction shall be allowed in the same manner that it is allowed under the internal revenue code except as otherwise provided in this section. The amount of the net operating loss that may be carried forward and carried back for Kansas income tax purposes shall be that portion of the federal net operating loss allocated to Kansas under this act in the taxable year that the net operating loss is sustained."

Therefore, FDIC argues that the Bank's net income for privilege tax purposes is equal to its federal taxable income.

FDIC points out that in calculating taxable income, I.R.C. § 172 explicitly allows a taxpayer to carry back a loss incurred in one year to offset income earned in another year. For the years applicable in this case, I.R.C. § 172(b)(1)(F) allowed the Bank to carry back a NOL to each of the 10 years preceding the year of the loss. FDIC, as receiver, applied for and received a refund of federal taxes paid for the years 1975 through 1984 based on carrying back to these years the Bank's 1985 NOL.

Because the Kansas statutes require use of federal income tax law, including determination of taxable income, subject to specific adjustments not relevant here, and because the Bank paid privilege taxes based upon its net income from the years 1975 through 1984, FDIC argues that this income should be redetermined to conform with federal law. Redetermination of net income by including the 1985 NOL indicates a refund, which FDIC argues should be allowed.

FDIC points out that the purpose behind allowing averaging of income over time is a basic principle of tax law needed to establish an equitable measure of real income of the taxpayer. The taxable year used by taxpayers to calculate income is an arbitrary time frame. Although necessary, the annual calculation does not adequately reflect fluctuating gains and losses a taxpayer might experience over a period of time. As the Oregon Supreme Court noted in *Christian v. Dept. of Rev.*, 269 Or. 469, 471, 526 P.2d 538 (1974):

"The purpose of the carryforward and carryback aspect of the net operating loss deduction is to overcome the rigidity inherent in the concept of an annual tax. [Citation omitted.] Without such a deduction the taxpayer who suffered a loss in one year and a gain in another would pay more tax than his true overall income would warrant."

The Department responds to these arguments by admitting that the language of 79-32,143(a) incorporates the federal statute regarding NOL into Kansas law, citing Cordes, *The Kansas Conformity Income Tax Act: Part II*, 17 Kan. L. Rev. 289, 310 (1969). Yet the Department argues that this does not mean Kansas uses the amount of the federal NOL but, instead, employs an entirely separate computation. Specifically, the Department points out that K.S.A. 79-32,117(b)(iii) (Ensley 1984) "adds back the federal NOL" and that 79-32,143 "requires a separate, state computation." The Department concludes that the Kansas statute uses the federal procedure but not the actual federal loss amount. The Department also points to a recent decision by the Director concluding that source losses of two Kansas City Power and Light subsidiaries in Wyoming could not be allowed as a Kansas deduction. The Department cites this decision, which of course is not binding on this court, to establish that Kansas privilege and income taxes do not use the amount of the federal NOL but, instead, require an independent determination of the state deduction.

The problem with the Department's argument is that the amount of the NOL was not before the Board and is not an issue in this appeal. FDIC does not dispute that Kansas statutes require a number of exclusions and adjustments not found in federal law. Kansas taxable income of a corporation is the corporation's federal taxable income with specified modifications. K.S.A. 79-32,138(a) (Ensley 1984). The Department does not argue that any of these modifications apply here. A NOL deduction "shall be allowed in the same manner that it is allowed under the internal revenue code except as otherwise provided in this section." K.S.A. 79-32,143(a) (Ensley 1984). Under 79-32,143(b), the amount of the loss to be carried back is defined as "the federal net operating loss after (1) all modifications required under this act applicable to the net loss in the year the loss was incurred; and (2) after apportionment as to source." Subsection (b) addresses the amount of the loss and not the manner in which the loss is to be taken. Only subsection (a) speaks to the manner in which the NOL is to be taken. The only logical meaning to be given subsection (a) is that the NOL, as defined in subsection (b), is allowed in the

year and manner as provided for in § 172 of the Internal Revenue Code. We conclude that the language of the statute requires that the NOL be allowed as it is under the Internal Revenue Code by carrying back the amount to prior years to reduce the Kansas taxable income.

The question remains, however, whether FDIC is barred from carrying the NOL for 1985 back to prior years because the Bank became insolvent in 1985.

FDIC filed a 1986 privilege tax return. Because the privilege tax is based upon the net income for the next preceding year, and the Bank had no net income due to its losses in 1985, the Bank paid no 1986 privilege taxes. According to the Department, because 1986 was not a privilege tax year the 1985 federal loss was not recognized and cannot be carried back to prior years. As support, the Department points out that 79-32,143(a) states that the amount of NOL to be carried back "shall be that portion of the federal net operating loss allocated to Kansas under this act in the taxable year that the net operating loss is sustained." The Department argues that the 1985 federal losses were never allocated to Kansas nor sustained in a privilege tax year. Because K.S.A. 79-1110 (Ensley 1984) specified that privilege tax statutes adopt provisions of the Code only "insofar as the same can be made applicable," the Department asserts that 79-32,143(a) cannot be made applicable to carry back a loss that does not exist for privilege tax purposes.

The Department cites several cases to support its argument. In *Litton Indus. Products v. Limbach*, 58 Ohio St. 3d 169, 569 N.E.2d 481 (1991), the Ohio Supreme Court dealt with a franchise tax, which was an excise tax upon corporations for the privilege of doing business in Ohio in corporate form. The corporation became subject to the tax on the 1st day of January of the calendar year that it was organized. In *Litton*, one corporation, Litton Medical Products, Inc., merged into Litton Industrial Products, Inc., on November 2, 1974. Litton Medical had a fiscal year from July to July. In the 1974 corporate franchise tax return for fiscal year 1973, Litton Medical reported a NOL. Litton Medical filed a 1975 corporate franchise tax return covering the fiscal year ending July 28, 1975, and also reporting NOL. In 1976, Litton Industrial, the corporation into which Litton Medical was merged,

filed a corporate franchise tax return seeking to carry over and deduct Litton Medical's NOLs. The Ohio statute defined "tax year" as "the calendar year in and for which the tax provided . . . is required to be paid." Ohio Rev. Code Ann. § 5733.04(F) (Page 1973).

Under the language of the Ohio statutes, the court concluded that a corporation measures the tax on the net income received in the year preceding the annual accounting period that contains January 1 of the taxable year. Therefore, the 1975 taxable year would be calculated by measuring net income in the preceding accounting period ending July 28, 1974. If Litton Medical had existed on January 1, 1975, the accounting period for the 1975 tax year would be the fiscal and taxable year ending July 28, 1974. Because Litton Medical was not in business on January 1, 1975, the fiscal year ending July 28, 1974, was not a taxable year for purposes of the statute allowing the NOL to be carried over to succeeding taxable years. Although Litton Medical incurred a NOL, the court found that the franchise tax does not recognize the loss as a deduction, and therefore neither Litton Medical nor its successor may deduct the loss. 58 Ohio St. 3d at 171.

FDIC distinguishes *Litton*, arguing that the Kansas statute is entirely different from the Ohio statute. The Ohio statute defines both "taxable year" and "tax year" in terms of franchise tax liability. In contrast, 79-32,143(a) allows carryback of any "federal net operating loss allocated to Kansas . . . in the taxable year that [it was] sustained," and K.S.A. 79-32,114(a) (Ensley 1984) specifically provides that a taxable year was "the same as his or her taxable year for federal income tax purposes." We agree. The Kansas statute does not require that the year of loss be followed by a year in which the Bank exercised the privilege. Because of the difference in the statutes, the Department's reliance on *Litton*, which turned on "the precise wording of the [Ohio] statute," 58 Ohio St. 3d at 170, is misplaced.

The Department cites other cases in support of its position. In *Pacific Wholesalers v. Mangerich*, 147 F. Supp. 867, 869 (D. Guam 1957), the court refused to allow a loss to be carried forward because it was not sustained in a taxable year. The loss was incurred in 1950, but no income tax was imposed in Guam until January 1, 1951. The court held the plaintiff could not deduct

the corporate loss experienced in 1950 because that was not a taxable year within the meaning of the United States income tax laws, which took effect in Guam on January 1, 1951.

In *Matter of Avien, Inc.*, 532 F.2d 273, 275-76 (2d Cir. 1976), the taxpayer could not use losses from 1963 because that involved a period of time occurring prior to the effective date of a city tax; therefore it was not a taxable year under the city tax laws. FDIC points out that the ruling in *Avien* rejected the city's "ingenious but untenable" argument that no losses could be taken until after the 1963 loss was allowed to be carried forward. Instead, the court concluded that only the deduction of the 1963 loss was barred because it preceded the effective date of the statute. Other losses that were incurred since the statute's effective date could be used to allow the NOL deduction in other years.

The Department also relies upon a set of Kansas cases that discuss a receiver's liability to pay a franchise tax. If a receiver is carrying on the business of a corporation as a going concern, the receiver is, in effect, exercising its corporate franchise, and the State properly looks to the receiver to pay the tax imposed. *State, ex rel., v. Sessions*, 95 Kan. 272, Syl. ¶ 6, 147 Pac. 789 (1915), *aff'd* 245 U.S. 627, 62 L. Ed. 518, 38 S. Ct. 60 (1917). A receiver "doing business" is carrying on the operation of the corporation, or some portion of it, in the usual and regular course of running the corporation for profit. *Wilson v. Bank*, 77 Kan. 589, 595, 95 Pac. 404 (1908). In *Wilson*, after paying its depositors and surrendering its certificate of authority to do business, the bank was no longer subject to the provisions of the banking act. Therefore, it was not "doing business" within the meaning of the statute requiring the filing of financial statements with the Secretary of State as a condition precedent to maintaining an action or recovering a judgment. 77 Kan. at 594-95. See *State v. Knights of the Ku Klux Klan*, 117 Kan. 564, 575, 232 Pac. 254 (1925) (citing *Wilson*, 77 Kan. 589), and *Lumber Co. v. State Charter Board*, 107 Kan. 153, 162, 190 Pac. 601 (1920) (Doing business "is the exercise of some of the functions and the carrying on of the ordinary business for which the company is organized [citations omitted]. Single and isolated transactions do not ordinarily constitute the doing of business.").

As further support, the Department relies upon the discussion regarding franchise tax by the United States Supreme Court in *Educational Films Corp. v. Ward*, 282 U.S. 379, 75 L. Ed. 400, 51 S. Ct. 170 (1931). The Court stated that, although a corporation has income in the preceding fiscal year, if it ceases to do business prior to the beginning of the next fiscal year it is not subject to a franchise tax.

"Since it can be levied only when the corporation both seeks or exercises the privilege of doing business in one year and has been in receipt of net income during its preceding fiscal year, the tax, whatever descriptive terms are properly applicable to it, obviously is not exclusively on income apart from the franchise." 282 U.S. at 388.

Here, in the order denying the claim, BOTA stated:

"The Bank was closed on November 21, 1985, and surrendered its license and privilege to do business as a bank on that date. The process of liquidation or winding up is not identical to doing business. Neither the corporate privilege nor franchise are exercised by the receiver. *State v. Sessions*, 95 Kan. 272, 147 [Pac.] 789 (1915) and *Wilson v. Bank*, 77 Kan. 589, 95 [Pac.] 404 (1908). In *Sessions*, the bank was held liable for tax payment due to the fact that it exercised its franchise in the first year that a tax was imposed. We believe that the converse should also be true, i.e. that the first year after the bank surrendered its license is the first year in which it is free of privilege tax. Without the exercise of the privilege, there is no tax liability. From and after November 21, 1985, there was no reason to reopen the privilege tax issue. We conclude that the purpose of the privilege tax is to levy against those who exercise the privilege of doing banking business."

BOTA concluded that, because neither FDIC nor the Bank was doing banking business when the losses were incurred, no privilege tax resulted for this year. Therefore, the prior year's income from operations would escape recognition as would the previous year's losses. BOTA concluded that no basis existed to redetermine income when no losses were recognized.

FDIC criticizes the Department's reliance upon *Wilson* and *Sessions* to support BOTA's conclusions here. As FDIC correctly points out, it is not attempting to exercise the Bank's privilege in its capacity as a receiver but is simply asserting that it should be able to deduct the Bank's 1985 losses in the Bank's income for the purpose of measuring the Bank's privilege tax liability for the years 1975 through 1984. The Bank paid the principal tax

those years but has not been allowed to reflect the enormous loss suffered in 1985.

FDIC also criticizes the Department for citing *First Nat'l Bank of Manhattan v. Kansas Dept. of Revenue,* 13 Kan. App. 2d 706, 779 P.2d 457 (1989), to support BOTA's ruling. FDIC argues that the decision in *First Nat'l Bank,* to the extent it is relevant at all, supports FDIC's argument. The Department cited *First Nat'l Bank* to support the statement that corporate income tax and privilege tax are different in significant ways. FDIC does not dispute this, 13 Kan. App. 2d at 711, but argues that the principal holding of *First Nat'l Bank* is that a bank may not combine its income with that of an affiliated nonbanking corporation in its privilege tax return to calculate the privilege tax. In reaching this decision, the Court of Appeals concluded that Kansas law requires that privilege tax liability and corporate tax liability must be determined based on the individual corporation's federal tax income. Thus, the court noted: "The differences between the privilege tax and the corporate tax lead us to the conclusion that a privilege tax filer and a corporate tax filer should file separate returns." 13 Kan. App. 2d at 711.

Rejecting the Department's criticism that FDIC had blurred the distinction between privilege tax and income tax, FDIC acknowledges that these are different taxes but argues that the net income used by the Kansas privilege tax statute is the same as the federal taxable income and that the NOL deductions available for one are available for the other. In support of its interpretation, FDIC points to other courts that have allowed deductions for NOL carryovers. In particular, FDIC relies upon a Colorado case, *In re Matter of Golden St. Bk.,* 37 Colo. App. 29, 543 P.2d 1307 (1975). According to FDIC, the Colorado franchise tax statute was the model used by the Kansas Legislature in developing the Kansas statutes. Therefore, FDIC argues that the decision in *Golden St. Bk.* is of particular importance in interpreting the Kansas statutes.

In that case, Golden State Bank was denied a refund by the Colorado Department of Revenue when the bank attempted to carry back the NOL it sustained in 1970. For the tax years 1967, 1968, and 1969, Golden State Bank filed Colorado state income tax returns computing its taxes under Colo. Rev. Stat. § 138-1-

55 (1965 Perm. Supp.) (§ 55) (franchise tax). This section was repealed April 1, 1970, for all taxable years beginning after December 31, 1969. Banks whose taxes had been computed previously under § 55 became subject to the preexisting general corporate tax under Colo. Rev. Stat. § 138-1-35 (1969 Perm. Supp.) (§ 35). When Golden State Bank filed its tax return for the year 1970, it sought to carry back its 1970 losses to the years 1967, 1968, and 1969 by using the losses as deductions in recomputing the amount of taxes due for those years. 37 Colo. App. at 30.

The Colorado Department of Revenue denied the claim for refund, arguing that the taxes under § 55 had been characterized as a franchise tax, and therefore the bank could not have carried back a NOL under Colo. Rev. Stat. § 138-1-59 (1965 Perm. Supp.) (§ 59) because it provides for carryback " 'for Colorado *income* tax purposes.' " 37 Colo. App. at 30-31. The department of revenue admitted that, beginning in 1970, the year of the bank's NOL, the bank was allowed to carry back losses under the provisions of § 59. But prior to 1970, the bank was subject to the franchise tax of § 55. According to the department. of revenue, this precluded Golden State Bank from deducting NOL under § 59. 37 Colo. App. at 31.

The court evaluated the Colorado statutes in detail and concluded that, prior to 1970, the year that § 55 was repealed, § 59 allowing deduction of NOL was available to banks formerly taxed under § 55. Section 59 had been applicable to both § 55 and § 35. When § 55 was repealed, nothing else was amended. By virtue of the repeal, both national and state banks became subject to § 35, which establishes taxes on all domestic and foreign corporations doing business in Colorado. 37 Colo. App. at 32-33.

The Colorado Court of Appeals found that the statutory intent was clear. The bank computed its net taxable income under Colo. Rev. Stat. § 138-1-38 (1963), which allows a NOL deduction under § 59. Section 59 permits the deduction, properly allocated, " 'in the same manner that it is allowed under the internal revenue code.' " 37 Colo. App. at 32. The Internal Revenue Code requires the NOL to be carried back if possible. The court concluded that § 59 was available to banks formerly taxed under

§ 55 and now taxed, along with other corporations, under § 35. 37 Colo. App. at 32.

The relevant language of the Kansas statutes is substantially identical to that of the Colorado statutes. Kansas banks are taxed based upon the Kansas taxable income of corporations. This includes allowing a deduction of NOL in determining Kansas taxable income "in the same manner that it is allowed under the internal revenue code." In *Golden St. Bk.*, the bank was no longer subject to a privilege tax because the statute had been repealed. FDIC argues that this is analogous to the situation here where the Bank was no longer subject to a privilege tax because the Bank was insolvent and a receiver had been appointed.

The Department counters that reliance upon *Golden St. Bk.* is misplaced because no question exists that the loss there was recognized in a Colorado income taxable year. In contrast, the 1985 losses experienced by the Bank here were not recognized or sustained for any Kansas tax purposes. The Department also points out that, in Colorado, if the legislative intent behind enactment of a statute is in doubt or ambiguous, the statute is to be construed in favor of the taxpayer. 37 Colo. App. at 33. In Kansas, the taxpayer carries the burden of proving that the deduction is clearly authorized. See *Palmer v. Commission of Revenue and Taxation*, 156 Kan. 690, 696, 135 P.2d 899 (1943). FDIC responds to this assertion by noting that the court in *Golden St. Bk.* did not just consider the effective date of the loss carryback provision but held that the provision incorporating federal law required that the deduction be allowed.

Finally, it should be noted that FDIC repeatedly argues that the position taken by the Department in this case directly contradicts the Department's prior published statements and actions in a previous case that is almost identical to this one. In 1981, FDIC, as receiver for the Mission State Bank, filed a privilege tax return that was clearly marked "final return" and that showed a large loss. FDIC filed a claim carrying the loss back to prior years to offset income in those years and sought a refund of $255,517 plus interest. The Department granted the refund claim. Furthermore, in January 1986 the Department published a privilege tax information bulletin that provided: "If a merger, consolidation or other event creates short taxable years for a privilege

filer, returns must be filed and taxes paid for each of the short taxable years." FDIC argues that these interpretations by the Department must be taken into account by this court. As support, FDIC cites *Wichita Board of Trade v. United States*, 352 F. Supp. 365, 369 (D. Kan. 1972), *aff'd in part, rev'd in part* 412 U.S. 800, 37 L. Ed. 2d 350, 93 S. Ct. 2367 (1973), where the court recognized that activities and conditions may develop that dictate prior administrative constructions and interpretations of a statute should no longer be binding if they do not achieve the general legislation's objectives. But a longstanding administrative interpretation of a statute should not be overruled except for weighty reasons. FDIC argues that the Department's prior interpretations of the privilege tax statute should not be disregarded.

In its brief, FDIC notes that, in a reply brief filed less than a year ago in *In re Tax Appeal of Peoples Savings & Loan Ass'n*, No. 64,371, unpublished Supreme Court opinion filed October 26, 1990, the Department ridiculed the suggestion that income for an 11-month period of the preceding calendar year should be disregarded for privilege tax purposes. The Department responds that the *Peoples* case differs in that the privilege of doing business in that case was never interrupted, whereas here, the Bank's privilege was interrupted and terminated. However, only weeks after taking this position, counsel for the Department acknowledged to BOTA in this case that, if the Bank had incurred income during the period ending November 21, 1985, "the shoe would be on the other foot, and we might be arguing their side."

K.S.A. 79-32,143(a) (Ensley 1984) allows a deduction for NOL to be carried back to prior years "in the same manner as it is allowed under the internal revenue code." The statute is unequivocal on this point and is not ambiguous. The parties agree that the Internal Revenue Code allowed a deduction of this NOL in 1985 to be carried back to the prior years of 1975 through 1984. FDIC received a refund from the IRS based upon a recalculation of the taxable income of the Bank over those years by including calculations that took into account the loss in 1985. The Kansas statutes require that this NOL be applied in the same manner as allowed under the Code. Nothing in the privilege tax statutes prohibits recalculation of the taxable income that is the

basis for figuring the privilege tax on years that have been paid. The Bank paid privilege tax in the years 1975 through 1984. The statute recognizes the NOL in "the taxable year that the net operating loss is sustained." "Taxable year" is the same as the taxable year for federal income tax purposes. K.S.A. 79-32,114 (Ensley 1984). Here, the loss occurred in 1985, which was a taxable year for the Bank. There is no additional requirement that the Bank have a net income in 1985 and/or still be operating as a bank on January 1, 1986, to avail itself of the provisions of 79-32,143(a). The Department should have allowed FDIC to carry back the NOL to prior years as was permitted by the IRS and is allowed here under 79-32,143(a).

The order of BOTA affirming the Kansas Department of Revenue's denial of FDIC's claim for a refund of privilege taxes is reversed.

SIX, J., dissenting: K.S.A. 79-1106 (Ensley 1984) and K.S.A. 79-1107 (Ensley 1984) signal the legislative intention of taxing a bank's privilege of doing business within the state. The privilege tax is in lieu of ad valorem taxes. The tax is paid to the State for the privilege of doing business within the state according to, or measured by, the privilege taxpayer's net income for the next preceding year.

K.S.A. 79-1106 (Ensley 1984) provides:

"It is hereby declared to be the intention of the legislature to levy a tax on national banking associations, banks, trust companies, and savings and loan associations, which tax shall be in *lieu of ad valorem taxes* which might otherwise be imposed upon the intangible assets of such national banking associations, banks, trust companies, and savings and loan associations." (Emphasis added.)

K.S.A. 79-1107 (Ensley 1984) states:

"Every national banking association and state bank located or doing business within the state shall annually pay to the state for the privilege of doing business within the state a tax according to or measured by its net income for the next preceding calendar year or fiscal year ending in the next preceding year to be computed as provided in this act. Such tax shall consist of a normal tax and a surtax and shall be computed as follows:

"(a) The normal tax shall be an amount equal to four and one-fourth percent (4¼%) of such net income; and

"(b) the surtax shall be an amount equal to two and one-eighth percent (2⅛%) of such net income in excess of twenty-five thousand dollars ($25,000).

"The tax levied shall be in lieu of ad valorem taxes which might otherwise be imposed by the state or political subdivisions thereof upon shares of capital stock or the intangible assets of national banking associations and state banks. The state of Kansas hereby adopts the method numbered (4) authorized by the act of March 25, 1926, amending section 5219 of the revised statutes of the United States (12 U.S.C.A. 548), relating to the manner and place of taxing national banking associations located within its limits."

FDIC was appointed receiver of the bank on November 21, 1985. FDIC did not receive any deposits or make new loans. At a town meeting on November 23, 1985, FDIC's bank closing manager advised debtors of the failed bank that they should take immediate steps to establish a banking relationship with another financial institution because FDIC was not a bank and was not in the business of making loans.

The BOTA order states in part:

"5. The Director's Order is brief and holds simply that a 1986 privilege tax return was not required or allowed. Since the return was not permissible, the loss reflected from operations after November 21, 1985, were not allowed.

"6. The fundamental thrust of FDIC's argument relies on coupling federal income tax provisions with the assessment of privilege tax. FDIC cites K.S.A. 79-1109 as authority for incorporating by reference the provisions of K.S.A. 79-32,138. While it is true that the statutes refer to federal taxable income, the privilege tax is specifically measured from the taxable income from the year preceding the year in which the return is filed. There is no dispute that any losses incurred by either Farmers & Merchants Bank or the FDIC were not incurred until 1985 and 1986. None of the losses which form the substance of this dispute were recognized in 1984.

"7. There are significant differences between the privilege tax and corporate income tax. *First Nat'l Bank of Manhattan v. Kansas Dept. of Revenue*, 13 Kan. App. 2d 706, 779 P.2d 457 (1989). The Board finds it significant that the measure for privilege tax purposes is the taxable income from the next preceding year and is paid for the exercise of banking privileges prospectively. See K.S.A. 79-1107.

"8. The bank was closed on November 21, 1985, and surrendered its license and privilege to do business as a bank on that date. The process of liquidation or winding up is not identical to doing business. Neither the corporate privilege nor franchise are exercised by the receiver. *State v. Sessions*, 95 Kan. 272, 147 P.2d 789 (1915) and *Wilson v. Bank*, 77 Kan. 589, 95 P[ac]. (1908). In *Sessions*, the bank was held liable for tax payment due to the fact that it exercised its franchise in the first year that a tax was imposed. We believe that the converse should also be true, *i.e.*, that the first year after the bank surrendered its license

is the first year in which it is free of privilege tax. Without the exercise of the privilege, there is no tax liability. From and after November 21, 1985, there was no reason to reopen the privilege tax issue. We conclude that the purpose of the privilege tax is to levy against those who exercise the privilege of doing banking business. As neither FDIC nor Farmers & Merchants were doing banking business when the losses were incurred, there is no privilege tax incidence. Just as the last year's *income* from operations escapes recognition, so also the last year's losses escape recognition. There is no basis to redetermine income when no losses are recognized.

. . . .

"10. The Board concludes that the losses sustained by Farmers & Merchants Bank or the FDIC are not recognizable for privilege tax purposes. As such, there is no cause to redetermine the income for years prior to 1986."

In Kansas the taxpayer carries the burden of proving that an exemption is clearly authorized. *Palmer v. Commission of Revenue and Taxation,* 156 Kan. 690, 696, 135 P.2d 899 (1943). In my view, the burden referred to in *Palmer* applies to FDIC's claim for a NOL deduction.

I would affirm the order of BOTA affirming the Kansas Department of Revenue's denial of FDIC's claim for a refund of privilege taxes.

LOCKETT, J., joins the foregoing dissenting opinion.