(916 P.2d 52)
No. 75,730

WILLIAMS NATURAL GAS COMPANY, *Petitioner/Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee.*

Opinion filed May 14, 1996.

*Kevin M. Fowler* and *John C. Frieden*, of Frieden, Haynes & Forbes, of Topeka, and *David P. Batow*, general counsel, and *Gary W. Boyle*, senior counsel, of Williams Natural Gas Company, of Tulsa, Oklahoma, for the appellant.

*Larry Cowger, David J. Heinemann*, and *Christopher G. Arth*, assistants general counsel, of the Kansas Corporation Commission, of Topeka, for the appellee.

*Richard W. Hird, James P. Zakoura*, and *David J. Roberts*, of Smithyman & Zakoura, of Overland Park, for intervenor Kansas Pipeline Partnership.

Before BRAZIL, C.J., LEWIS and GREEN, JJ.

LEWIS, J.: In March 1994, Kansas Pipeline Partnership (KPP) and Kansas Natural Partnership (KNP), collectively the Joint Applicants, filed an application before the Kansas Corporation Commission (KCC) for a rate increase. There were several intervenors in the rate case at the KCC level. The only intervenor who remains a party on appeal is Williams Natural Gas Company (WNG). For that reason, we need not identify the other intervenors. KPP and KNP merged as a result of the KCC hearings and no longer have separate identities. However, we will still refer to them as Joint Applicants or by their separate former identities in this opinion.

In summary, the entities still litigating on appeal are the Joint Applicants, the KCC, and WNG. WNG is aggrieved by the action taken by the KCC and occupies the position of the appellant. The other parties all seek to uphold the order of the KCC and are in the position of appellees.

The record of the KCC hearing is voluminous. After considering all the evidence, the KCC granted relief to the Joint Applicants in the form of a multi-faceted rate increase. WNG argues that the KCC erred in allowing the Joint Applicants to recover certain "market entry costs" and certain "carrying costs." There are other issues associated with the "market entry costs" on appeal that, for reasons which will become apparent, are moot. The facts on which the rate increase in question was granted are set forth in a very abbreviated manner in this opinion.

The factual background of this particular rate case began in 1984. In that year, Kansas Pipeline Company, L.P., (KPCLP) and Phenix Transmission Company (Phenix) were granted certificates of convenience and necessity to operate as intrastate natural gas suppliers.

KPCLP and Phenix were formed and granted certificates of convenience and necessity to introduce competition into the natural gas marketplace comprising the state of Kansas. WNG is an interstate natural gas supplier and, as such, is regulated by the Federal Energy Regulatory Commission. It appears from the record that in 1984 and for some years prior thereto, WNG had a virtual mo-

nopoly over the natural gas market in the state of Kansas. The KCC desired to eliminate this monopoly and granted certain concessions to KPCLP and Phenix in the hopes that these entities would successfully create at least a duopoly in the market.

WNG has been relatively successful in maintaining its position in the natural gas market. For instance, KPCLP's and Phenix's KCC certification required those entities to make all of their deliveries through Western Resources, Inc. (WRI). KPCLP and Phenix both attempted to do business with WRI but were not successful. That failure can be explained in various ways, but it is apparent that WRI at that time was doing its business with WNG. Thus, WNG is affixed with considerable blame for the failure of KPCLP and Phenix.

Both KPCLP and Phenix were failed ventures. They did not earn the revenues anticipated and apparently lost considerable amounts in operating revenues. There are a variety of reasons for the failure of these entities, but the KCC and the Joint Applicants blame WNG and WRI. In fact, the KCC specifically blamed WRI for KPP's "lag in developing business." It found that KPP's problems were due to the fact that "WRI was either unable or unwilling to alter or to potentially place in jeopardy its long-term relationship with WNG." In order to punish WRI for not doing business with KPP, the KCC has authorized nearly $4 million in market entry costs to be recovered by direct billing only WRI.

In 1990, the Joint Applicants were formed. KPP was formed as a partnership between Kansas Pipeline Company and OKM Gas Pipeline Company. KPP was formed "for the purpose of *acquiring and operating the natural gas pipeline assets of KPCLP*." (Emphasis added.) KNP was formed as a partnership between Kansas Natural, Inc., and OKM Gas Pipeline Company "for the purpose of *acquiring and operating the pipeline assets of KNI* (formerly Bishop which was formerly Phenix)." The new entities were formed; KPCLP's certificate of convenience and necessity was transferred to KPP, and Phenix's certificate of convenience and necessity was transferred to KNP.

It appears that the Joint Applicants paid approximately $44 million for the pipeline assets of KPCLP and Phenix. It is clear that

only the assets of KPCLP and Phenix were purchased. This is to say that this was an assets-only sale; there was no purchase of stock, no outright assumption of debts or past sins as may occur when the stock of a corporation is purchased instead of its assets. In other words, the Joint Applicants are not the lawful successors of KPCLP and Phenix; they are only entities which purchased the assets of KPCLP and Phenix.

In 1991, in a largely ex parte proceeding, the Joint Applicants obtained certain "accounting orders" from the KCC. WNG was not a party to this proceeding and did not seek to intervene. KNP was authorized by the KCC to amortize over 30 years "all of those authorized amounts permitted by the Commission to be earned by KNP, but not earned, in the period May 1985, through November 30, 1990, due to litigation initiated against the Commission and KPP by others, as well as other causes." The KPP accounting order contained the same language but limited the period covered to a period from January 1985 to October 31, 1988. We should note that factually neither of the Joint Applicants existed during the period of time covered by the special accounting orders and, despite the language of those orders, could not possibly have been authorized to earn the amounts referred to in the special accounting orders. The Joint Applicants did not come into existence until 1990, and it appears that not even the KCC could have authorized or enabled a nonexistent entity to earn money during a time that it did not exist.

The next significant event is the current rate case. The Joint Applicants have won a rate increase, and WNG opposes it. The Joint Applicants blame WNG for most of their problems, past, present, and future. They suggest that WNG's only motive is to preserve its monopoly position and that it is doing everything it can to "prevent or frustrate the entry of the Applicants as market participants."

WNG argues that the rate increase granted to the Joint Applicants gives them an unfair competitive edge. WNG suggests that even though its prices for natural gas are much lower than those of the Joint Applicants, certain entities such as WRI are bound by

contract to purchase natural gas from the Joint Applicants, regardless of the difference in price.

The atmosphere in which this case was tried appears to have been one of mutual hostility and suspicion. This attitude continues to evidence itself on the appellate level. In essence, the argument is made that the KCC orders were directed at breaking up a monopoly and that this is such a laudable goal that the orders must be upheld. While we acknowledge that the goal of the KCC to introduce competition into the sale of natural gas was a laudable one, we do not believe that goal increased the power or authority of the KCC beyond the rule of law.

The KCC issued a number of orders in this case dealing with many different issues. WNG's only claim of error is directed at the "market entry costs" allowed to be recovered by the Joint Applicants. There is no claim of error as to any of the other orders issued by the KCC in this case.

At this point, we pause to note that it is difficult to precisely define what is meant by market entry costs. Despite that difficulty, we will use that term in this opinion. In general, these market entry costs are losses or shortfalls in revenue which were experienced by KPCLP and Phenix from 1985 through 1990. They appear to be somewhat in the nature of net operating losses. By whatever name we use to describe them, they were incurred by KPCLP and Phenix, and the KCC order treats them as assets of the Joint Applicants.

WNG claims that the commission erred in the following particulars:

(1) In authorizing the Joint Applicants to recover $10.5 million in market entry costs experienced by Phenix from May 1985 through November 30, 1990.

(2) In authorizing the Joint Applicants to recover $2.5 million in market entry costs incurred by KPCLP from January 1985 through October 31, 1988, along with carrying costs of $1,077,466 on that $2.95 million of market entry costs. These market entry costs and carrying costs were to be recovered by a direct billing directed solely to WRI and amortized over a period of 3 years.

It should be noted that the KCC allowance of the market entry costs was not without controversy and considerable dispute. The KCC legal staff opposed these allowances at the trial level, although they are vigorous in upholding them on this appeal. One of the three KCC commissioners dissented, saying, among other things:

"[S]imply stated, the Joint Applicants did not experience the $10.5 and $2.95 million shortfalls nor did they assume any part of a debt that represents these sums. It stretches the bounds of intellectual integrity, albeit a most creative effort, that one could characterize the shortfall in projected earnings on revenues as an 'asset.' "

## JURISDICTION

We begin by examining our jurisdiction to hear this appeal. The Joint Applicants argue that WNG has failed to exhaust its administrative remedies. If they are correct, we have no jurisdiction to hear this appeal. See K.S.A. 1995 Supp. 66-118b.

The question is whether WNG was required to file a petition for reconsideration of the third KCC order issued in this case. There were four orders issued: one on March 17, 1995; one on June 16, 1995; one on November 6, 1995; and the final order on December 8, 1995. WNG filed petitions for reconsideration of the first two orders but did not do so on the order issued in November 1995.

K.S.A. 1995 Supp. 66-118b reads:

"No cause of action arising out of any order or decision of the commission shall accrue in any court to any party unless such party shall petition for reconsideration in accordance with the provisions of K.S.A. 77-529 and amendments thereto. No party shall, in any court, urge or rely upon any ground not set forth in the petition. *An order made after reconsideration, abrogating, changing or modifying the original order or decision, shall have the same force and effect as an original order or decision, including the obligation to file a petition for reconsideration,* as provided in this section, as a condition precedent to filing an action for review thereof. The time for filing an appeal of any order or decision in a proceeding shall run from the date that all petitions for reconsideration in such proceeding have been denied or such petitions for reconsideration are deemed denied pursuant to subsection (b) of K.S.A. 77-529 and amendments thereto." (Emphasis added.)

The Joint Applicants argue that the statute requires a petition for reconsideration be filed after each and every order "abrogating,

changing or modifying the original order." They contend that this is a mandatory step required in all cases regardless of the circumstances.

WNG argues it was not aggrieved by the KCC order of November 6, 1995, and should not be required to seek reconsideration under those circumstances. "The purpose of an application for rehearing is to permit the Commission to correct errors which are called to its attention and thus avoid a judicial review and determination." *Graves Truck Line v. State Corporation Commission*, 195 Kan. 82, 85, 402 P.2d 757 (1965). WNG suggests that there was no purpose to be served by its seeking reconsideration of an order that was basically in its favor.

The KCC issued four orders. Each order was identical to the previous order with the exception of that portion of the previous order which was modified or changed by the order in question. The December 8, 1995, order changed nothing from the November 6, 1995, order; it merely denied the Joint Applicants' final petition for reconsideration. WNG sought reconsideration of each of the first two orders issued by the KCC. The November order, which was the final substantive order, modified the previous order in favor of WNG. Although the November order restated virtually everything that had been said in the first two orders, the only new materials in the November order were modifications of a previous order, and those modifications were in favor of WNG. By the time the November order was issued, WNG had already called to the attention of the KCC all of the errors it asserts on this appeal. To the extent the November order modified earlier orders, WNG was not aggrieved by the modifications.

The question presented involves a commonsense interpretation of the statute and some consideration of judicial economy. As stated earlier, each KCC order was identical to the others except as to matters modified by the new order. WNG filed petitions to reconsider the first two orders. In those petitions, it called to the attention of the KCC all of the claimed error it asserts on appeal. As a result of WNG's petition for reconsideration of the first two orders, the KCC had an opportunity to correct the errors which were called to its attention and thus avoid a judicial review and

determination. The November order issued by the KCC simply restated matters decided in the first two orders. WNG was not aggrieved by any new material in the November order. Was WNG required to ask for reconsideration of the November order to exhaust its administrative remedies? We hold that it was not.

The KCC, in this case, made no findings with regard to the exhaustion of administrative remedies. However, the KCC states in its brief: "WNG has exhausted its administrative remedies and has timely filed this Petition for Judicial Review." While the position of the KCC is not binding on this court, we consider it persuasive. Usually, "interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to judicial deference." *State Dept. of SRS v. Public Employee Relations Board*, 249 Kan. 163, 166, 815 P.2d 66 (1991).

We do not believe that K.S.A. 1995 Supp. 66-118b should be interpreted in a manner so as to require a party to take needless actions which only waste judicial economy and which are, in the final analysis, an affront to the sensible administration of justice. To require a party to seek reconsideration of an order which does not aggrieve it would do just that. " '[T]he legislature is presumed to intend that a statute be given a reasonable construction, so as to avoid unreasonable or absurd results." *State Bank Commissioner v. Emery*, 19 Kan. App. 2d 1063, 1068-69, 880 P.2d 783 (1994). We believe the construction urged by the Joint Applicants would result in an unreasonable or absurd result. We note that K.A.R. 82-1-235 appears to permit only "aggrieved" parties to file for reconsideration: "Any party *being aggrieved* by any order or decision of the commission may file a petition for reconsideration before the commission." (Emphasis added.)

We cannot interpret K.S.A. 1995 Supp. 66-118b to require the filing of endless and needless petitions for reconsideration in order to exhaust one's administrative remedies. We hold that no petition for reconsideration of an order in a multiple-order KCC action need be filed to exhaust administrative remedies when the following facts are present:

    (1) The appellant has previously filed petitions for reconsideration of prior orders issued by the KCC in which all errors

claimed on appeal have been brought to the attention of the commission; and

(2) the order from which no petition for reconsideration was filed modified a previous order in favor of the appellant so that appellant cannot be said to have been "aggrieved" by the order.

We believe the position advocated by the Joint Applicants would result in an absurdity. In a multiple-party case, the position taken by the Joint Applicants would require each party to file a petition for reconsideration on every order issued by the KCC until the KCC finally issued an order which was absolutely identical to the previous order. This could create an endless circle similar to a dog chasing its tail. The KCC routinely restates in each order everything it has said in its earlier orders. The only new material is contained in the modifications of the previous order. If a party is not aggrieved by the modifications and has previously called the attention of the KCC to all of the elements of error it asserts on appeal, it should not be required to petition for reconsideration of the only new material in the order.

We hold WNG has exhausted its administrative remedies in this case and that we have jurisdiction to deal with the merits of this appeal.

## STANDARD OF REVIEW

Pursuant to K.S.A. 66-118c, this court's review of an order of the KCC is in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* WNG contends the KCC erroneously interpreted or applied the law, that the KCC's order is not supported by substantial evidence, and that the KCC's decision is otherwise unreasonable, arbitrary, or capricious. Those claims of error are consistent with the KJRA. See K.S.A. 77-621. In *Crawford v. Kansas Dept. of Human Resources*, 17 Kan. App. 2d 707, 708, 845 P.2d 703 (1989), *rev. denied* 246 Kan. 766 (1990), we said:

"Judicial review of orders of an administrative body is governed by the [KJRA]. The scope of review is stated in K.S.A. 77-621. The agency's findings are presumed valid on review and the agency's order may only be set aside by the district court

if it is not supported by substantial competent evidence, is without foundation in fact, or is otherwise unreasonable, arbitrary, or capricious. [Citation omitted.]

"Judicial review is limited to these questions of law. K.S.A. 77-621 does not limit a court's review of an agency's interpretation or application of a matter of law. In reviewing a question of law, a court may substitute its judgment for that of the agency. [Citation omitted.]"

We believe that the following quotation from *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 496-97, 720 P.2d 1063 (1986), adequately provides guidance on our scope of review:

"We should next consider the scope of judicial review where an appeal is taken to the courts from an order of the KCC in a rate-making case. The scope of review is discussed in the decision of the Court of Appeals in *Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979), where the court stated:

'K.S.A. 1978 Supp. 66-118d limits judicial review of an order by the commission to determining whether the order is "lawful" or "reasonable." [Citation omitted.] A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. [Citation omitted.] An order is "lawful" if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. [Citation omitted.] An order is generally considered "reasonable" if it is based on substantial competent evidence. [Citation omitted.]

'The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. [Citation omitted.] Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. [Citation omitted.] The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. [Citation omitted.] Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. [Citations omitted.]' "

## MARKET ENTRY COSTS

The real issue to be resolved on this appeal is whether the KCC had the authority to permit the Joint Applicants to recover certain "market entry costs." These costs were incurred by other entities

at a time when the Joint Applicants did not exist. In specific terms, the Joint Applicants are being permitted to recover market entry costs of $10.5 million incurred by Phenix, $2.95 million in market entry costs incurred by KPCLP, and $1 million in carrying costs on the market entry costs incurred by KPCLP. The KCC permitted the $10.5 million in costs incurred by Phenix to be added to the Joint Applicants' rate base and the $2.95 million and $1 million in costs incurred by KPCLP to be direct billed to WRI. The recovery of these costs is to take place over a designated period of time.

In his dissent, Commissioner McKee disagreed with the allowance of these market entry costs. He pointed out that these costs were not incurred by the Joint Applicants but were incurred by two unrelated entities prior to the Joint Applicants' existence. We find the dissent to be more in accordance with our views than is the majority decision.

We have no problem with the allowance of market entry costs as a part of rate base when these costs were either incurred by or acquired by the entity to whom the award is made. However, we do not believe it requires any citation of authority to conclude that the KCC has no power to permit an applicant to recover market entry costs when the applicant did not incur or otherwise acquire the costs in question. To do this would be similar to allowing a loan applicant to add the value of his or her best friend's home to the applicant's property statement because the applicant had purchased his or her best friend's automobile.

We have examined this record and see no evidence which shows that the Joint Applicants either acquired or "inherited" the operating losses of KPCLP or Phenix. It is beyond doubt that they most certainly did not "incur" the costs in question.

The evidence indicates that the Joint Applicants purchased only the "assets" of KPCLP and Phenix for approximately $44 million. The total purchase price of these assets appears to be part of the Joint Applicants' rate base *before* the additions of the market entry costs in question. This suggests that if somehow these market entry costs were lawfully acquired by the Joint Applicants, they were acquired for no consideration.

Another troubling aspect is that the Joint Applicants purchased only the assets of KPCLP and Phenix. The purchase was neither a stock nor an equity transaction. In plain English, they did not buy the business, warts and all; they bought only the assets. The nature of this transaction is further indicated by the fact that the purchasers did not directly assume any debt or liability as a result of its purchase of the assets of the two entities in question.

Again, it is vital to keep in mind that this was not a stock transaction where the corporate identity, body and soul, was purchased. Such a purchase might, in all probability, carry with it such things as net operating losses, liabilities, and other ethereal matters which attach to the corporate body. In this case, the Joint Applicants did not acquire the corporate body; they acquired only the corporate assets. They did not acquire the very existence and soul of the now defunct entities.

Determining what property is to be included in the rate base is a question of fact. *Kansas Gas & Electric Co. v. State Corporation Commission*, 218 Kan. 670, Syl. ¶ 3, 544 P.2d 1396 (1976). We are not a finder of fact; that status is occupied by the KCC. Despite its status as a finder of fact and despite the vital nature of the question at hand, the KCC failed to focus on or make findings on this issue. This makes meaningful appellate review impossible.

We have said before and say again that the allowance of the market entry costs in question was error unless the applicants either incurred these costs or somehow acquired them when they purchased the assets of KPCLP and Phenix. Since it is obvious the Joint Applicants could not have "incurred" these losses, the question becomes whether they somehow acquired them. There are no KCC findings on this important issue.

For that reason, we reverse the orders of the KCC relating to the allowance of market entry costs and remand for additional hearings and findings. On remand, the KCC must determine if the market entry costs in question were somehow acquired by the Joint Applicants. If they were acquired, it must be determined when and how such an acquisition was and could have been made. If on remand the KCC cannot determine that these market entry costs were somehow lawfully acquired by the Joint Applicants, they may

not be recovered, as part of the rate base or otherwise, by the Joint Applicants. If the KCC is convinced on remand that somehow these assets were acquired by the Joint Applicants, the allowances may be restored.

We note that our uncertainty here is not whether market entry costs can be recovered in an appropriate case. We do not dispute that this can be done. Our concern is that the KCC has permitted the Joint Applicants to recover the losses of an unrelated entity which the Joint Applicants neither incurred nor acquired. It is this issue which must be resolved on remand.

Throughout these proceedings, the argument has been made that the KCC may do nearly anything it desires if it is achieving a laudable goal such as breaking up a monopoly in the marketplace. We disagree. However laudable its motives may be, the KCC is still controlled by the rule of law. Even if it furthers the cause of breaking up a monopoly, the KCC has no power to permit recovery of costs which were incurred by a prior unrelated entity and which were never acquired by the applicant.

The other issues raised on appeal are rendered moot by our decision. Those issues all turn on the ability of the Joint Applicants to recover the market entry costs in question. Unless and until that question is resolved, we need not and do not reach the remaining issues.

We do, however, want to flag one issue. That is the question of whether the KCC has the power to punitively order certain costs to be recovered by the Joint Applicants in a direct bill to one entity. In this case, nearly $4 million in market entry and carrying costs were ordered to be recovered by the Joint Applicants by directly billing those costs to WRI over a 3-year period. We find the exercise of such a punitive and singly focused power by the KCC to be somewhat alarming. In the long run, it is the customers of WRI who will pay this direct billing. We question the power of the KCC to act in so punitive a manner against one entity in the natural gas field. That issue is, for the moment, moot. However, if on remand the KCC should reinstitute its direct billing order, it should be prepared to identify and document its authority to punitively and directly bill costs to one entity.

The orders authorizing the Joint Applicants to recover market entry costs and carrying costs are reversed. The matter is remanded to the KCC with the following directions:

(1) The KCC must determine if, when, and how the Joint Applicants acquired market entry costs incurred by two unrelated entities prior to the formation of the Joint Applicants. If necessary, the KCC may hold additional hearings and may receive additional evidence on the issues in question.

(2) If the market entry costs were neither incurred nor acquired by the Joint Applicants, the KCC shall not permit such costs to be added to the Joint Applicants' rate base or recovered by Joint Applicants in any fashion.

(3) In the event the KCC finds that the market entry costs and carrying costs were acquired by the Joint Applicants, the KCC should restore its earlier orders authorizing recovery of those costs.

Reversed and remanded.