(42 P.3d 110)
No. 88,012

KANSAS INDUSTRIAL CONSUMERS, *Petitioner/Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee*.

Opinion filed March 8, 2002.

*David J. Roberts* and *James P. Zakoura*, of Smithyman & Zakoura, Chartered, of Overland Park, for appellant.

*Caroline Ong*, advisory counsel, and *Susan B. Cunningham*, general counsel, of the Kansas Corporation Commission, for appellee.

*Walker Hendrix* and *Niki Christopher*, for intervenor Citizens' Utility Ratepayer Board.

*Kirk T. May* and *Matthew T. Geiger*, of Rouse Hendricks German May PC, of Kansas City, Missouri, for intervenor The Goodyear Tire & Rubber Company.

*Sarah J. Loquist* and *Thomas R. Powell*, of Hinkle Elkouri Law Firm L.L.C., of Wichita, for intervenor Unified School District No. 259.

*Martin J. Bregman*, Executive Director, Law, of Western Resources, Inc., of Topeka; *Michael Lennen*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita; and *James M. Fischer*, of Fischer & Dority, P.C., of Jefferson City, Missouri, for intervenor Western Resources, Inc., and Kansas Gas and Electric Company.

Before RULON, C.J., LEWIS and KNUDSON, JJ.

KNUDSON, J.: Kansas Industrial Consumers (KIC) filed this petition for judicial review from a final order of the Kansas Corporation Commission (KCC) in an electric utility rate proceeding instituted by Western Resources, Inc. (WRI) and Kansas Gas and Electric Company (KGE). KIC companies include: Atchison Casting Corporation, The Boeing Company, Farmland Industries, Inc., Delphi Automotive Systems, Inc., L.L.C., Hercules Cement Corporation d/b/a Heartland Cement Company, Kansas Hospital Association, and Raytheon Aircraft Company.

Jurisdiction is conferred upon this court under K.S.A. 2001 Supp. 66-118a(b) and in accordance with the Act for Judicial Re-

view and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* We note in a separate but related proceeding, WRI and KGE have also filed a petition for judicial review from the KCC's order. See *Western Resources, Inc. v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 348, 42 P.3d 162 (2002).

On appeal, KIC challenges the KCC's calculation of revenue requirements of WRI and KGE. Specifically, KIC questions the KCC's adoption of a hypothetical equity structure and its findings regarding revenues and operating expenses. We conclude the KCC acted within its authority, and there exists substantial competent evidence to support its findings.

## *The KCC Proceedings*

In November 2000, WRI filed an application with the KCC, seeking approximately a $92,000,000 rate increase for its electric service division. On the same date, Kansas Gas and Electric Company (KGE), a wholly owned subsidiary of WRI, also filed an application with the KCC for a rate increase of almost $58,000,000. Both applications were consolidated into the same agency docket, 01-WSRE-436-RTS. Public hearings were held by the KCC in April 2001 across the state.

Various parties intervened in the proceedings before the KCC. In addition to WRI and KGE, the intervenors included Unified School District No. (U.S.D. 259), Citizens' Utility Ratepayer Board (CURB), City of Wichita, City of Topeka, the Empire District Electric Company (Empire), Kansas Municipal Energy Agency, The Goodyear Tire & Rubber Company (Goodyear), ONEOK, Inc. d/b/a Kansas Gas Service Company, and the Southcentral Municipal Energy Agency.

The KCC held evidentiary hearings on the applications from May 17, 2001, through June 4, 2001. Thereafter, all the parties had the opportunity to file post-hearing trial briefs and reply briefs.

On July 25, 2001, the KCC issued a decision on the rate applications. The order dealt with a wide variety of issues pertaining to the revenue requirements of WRI and KGE. In conclusion, the KCC ordered a decrease of KGE's revenue requirement by over $41,000,000 and increased WRI's revenue requirement by

$18,470,583. Timely petitions for reconsideration attacking various portions of the initial order were filed by KIC, KCC Staff, WRI and KGE, and the City of Wichita.

On September 5, 2001, the KCC issued its order on reconsideration. In this order, the KCC made various adjustments with respect to the restricted share unit adjustment and the Board of Directors' fees, and to account for increased coal prices, corporate-owned life insurance, and revenues from the sale of electricity from Jeffries Energy Center to Empire. The KCC also clarified the effective date of interest synchronization and its ruling as to the ONEOK savings adjustment. The end result was a determination that WRI had an increased revenue requirement of $25,401,336 and KGE had a decrease in its revenue requirement of $41,062,598.

Timely petitions for reconsideration were filed from the order on reconsideration by KIC, WRI and KGE, and Goodyear. The petitions for reconsideration were denied in the KCC's final order of October 11, 2001. KIC filed this timely petition for judicial review.

## Standard of Review

Pursuant to K.S.A. 66-118c, this court's review of an order of the KCC is in accordance with the KJRA, K.S.A. 77-601 *et seq.* In its brief, KIC contends the KCC erroneously interpreted or applied the law, that the KCC's order is not supported by substantial evidence, and that the KCC's decision is otherwise unreasonable, arbitrary, or capricious. Those claims of error are consistent with the scope of review under the KJRA. See K.S.A. 77-621.

On appeal, the KCC's findings are presumed valid, and its order may only be set aside by the court if it is not supported by substantial competent evidence, is without foundation in fact, or is otherwise unreasonable, arbitrary, or capricious. *Williams Natural Gas Co. v. Kansas Corporation Comm'n*, 22 Kan. App. 2d 326, 334-35, 916 P.2d 52, *rev. denied* 260 Kan. 1002 (1996).

It has been repeatedly recognized that the legislature vested the KCC with broad discretion and its findings are presumed valid on review. Because discretion is delegated to the KCC, the courts do

not have authority to substitute their judgment for that of the KCC. Moreover, the KCC's decisions involve complex problems of policy, accounting, economics, and other special knowledge that go into fixing utility rates. As a result, the court may not set aside a KCC order merely because the court would have arrived at a different conclusion had it been the trier of fact. The court may reverse or nullify a KCC order only when the decision " 'is so wide of the mark as to be outside the realm of fair debate.' " *Williams Natural Gas*, 22 Kan. App. 2d at 335 (quoting *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 497, 720 P.2d 1063 [1986]).

### *The Use of a Hypothetical Equity Structure*

In this first issue, KIC argues Kansas law prohibits the KCC from utilizing a hypothetical capital structure for a public utility when determining rates. KIC appears to argue that any "hypothetical" capital structure, by its terms, is based on costs not actually incurred by the utility and is, therefore, unlawful.

In its initial order, the KCC adopted a hypothetical capital structure for WRI and KGE because of the debt/equity imbalance with a stand-alone utility operation. Staff recommended a capital structure of 51.62% long-term debt, 44.14% common stock, 0.90% preferred stock, and 3.34% accumulated deferred investment tax credits. WRI and KGE agreed this structure was not unreasonable, as did KIC. The KCC concluded this recommendation was the most reasonable and valid; the KCC found it was directly related to the actual conditions and operations of the utility and was based on a detailed cash-flow analysis. In adopting a hypothetical capital structure, the KCC indicated it would adjust the interest expense factor through interest synchronization to prevent WRI from collecting from ratepayers income tax expense it would not actually pay. The KCC determined the interest synchronization need only be applied if a stand-alone utility with the unusual high debt capital structure actually came into existence; the KCC also held that if the stand-alone utility of this nature did not materialize or materialized for only an insignificant amount of time, the adjustment would not be

applied and the interim rates, upon motion, would be made permanent. KIC attacks both of these determinations.

### Did KIC Preserve This Issue for Review?

The KCC argues KIC did not preserve this issue for review. First, the KCC notes KIC agreed that Staff's proposed hypothetical capital structure, which the KCC adopted, was reasonable and supported by the evidence. The KCC also contends KIC has changed the theory of its case on appeal.

In its post-hearing brief filed with the KCC, KIC addressed the capital structure issue. KIC argued WRI's and KGE's hypothetical capital structure would overcharge Kansas retail electric customers. KIC cited its own witness' testimony that proposed a hypothetical 14% equity factor, with the condition that revenues generated based on this factor be limited to the electrical operations and not be allowed to flow to WRI's nonregulated companies. KIC also recognized that CURB's hypothetical structure of 39% equity and Staff's proposed 44.14% allocations were supported by material and credible evidence. In its brief, KIC seemed to recognize the capital structure issue was being determined in the "extraordinarily unusual circumstance" of a public utility with no equity and a significant debt unrelated to its electric operations.

After the KCC filed its initial order adopting Staff's proposed 44.14% equity figure, KIC filed a timely petition for reconsideration. In this petition, KIC argued the KCC should adjust the equity component from the 44.14% to a level of no more than 35%, the actual equity component reflected in WRI's filings with the Securities and Exchange Commission (SEC). KIC argued that Staff's recommendation, as adopted by the KCC, was conditioned on an interest synchronization adjustment; it also argued the figure unfairly penalized ratepayers and favored shareholders. Finally, KIC argued that if the KCC was going to withhold ruling on the interest synchronization adjustment, it should adopt CURB's equity figure of 39.16%. At no point in this petition did KIC assert the use of the hypothetical rate structure was per se illegal.

In its order on reconsideration, the KCC summarily rejected KIC's arguments regarding the equity component. Instead, the

KCC concluded Staff's proposal was reasonable and supported by the record. KIC filed a timely petition for reconsideration from this order as well. KIC adopted the same arguments regarding the equity component made in its initial petition for reconsideration. Again, there was no challenge to the use of a hypothetical capital structure, only the choice of the figures adopted by the KCC. These arguments were again summarily rejected in the KCC's final order.

K.S.A. 2001 Supp. 66-118b provides that a party seeking review of a KCC order must petition for reconsideration of the order in accordance with K.S.A. 2001 Supp. 77-529. A party may not rely upon any ground in a court proceeding that was not "set forth" in the petition for reconsideration. K.S.A. 2001 Supp. 66-118b. Under K.S.A. 2001 Supp. 77-529(a), the party must file a petition for reconsideration "stating the specific grounds upon which relief is requested." See *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 222, 227-28, 943 P.2d 494 (1997), *aff'd in part, rev'd in part* 264 Kan. 363, 956 P.2d 685 (1998).

"Any ground not set forth in the application for rehearing cannot be relied upon in judicial review proceedings." *Peoples Natural Gas v. Kansas Corporation Commission*, 7 Kan. App. 2d 519, 526, 644 P.2d 999, *rev. denied* 231 Kan. 801 (1982). The purpose of requiring that all issues be included in the petition for reconsideration is to inform the KCC and other parties where mistakes of law and fact were made in the order. *Citizens' Utility Ratepayer Bd.*, 24 Kan. App. 2d at 228; see *Southwestern Bell Tel. Co. v. Kansas Corporation Comm'n*, 29 Kan. App. 2d 414, 29 P.3d 424 (2001). Requiring a petition for reconsideration permits the KCC to correct errors which are called to its attention and thereby perhaps avoid judicial review. *Williams Natural Gas*, 22 Kan. App. 2d at 332.

In attacking the KCC's order on appeal, KIC first contends Kansas law prohibits any use of a "hypothetical" capital structure because it is not based on actual costs of the utilities. KIC is arguing, for the first time on appeal, that the KCC was barred from considering any equity figure not based on actual costs.

We note KIC's arguments were not raised in either its trial brief or in any of its petitions for reconsideration. Accordingly, this issue is not properly before the court.

As noted by WRI and KGE, the courts of Kansas have recognized the KCC's power to use a hypothetical equity ratio for rate of return purposes. See *Sekan Electric Coop. Ass'n v. Kansas Corporation Commission*, 4 Kan. App. 2d 477, 480, 609 P.2d 188 (1980) (quoting E. Nichols and F. Welsh, *Ruling Principles of Utility Regulation, Rate of Return Supplement A*, 157 [1964]) (" '[T]he owners and managment of a utility have the right to determine what the debt-equity ratio should be, but they may not always make the ratepayers foot the bill resulting from the choice.' ").

### *Is the Equity Component Adopted Supported by the Record?*

KIC also argues the 44.1423% equity component adopted by the KCC is not supported by substantial competent evidence. KIC argues that Staff's equity calculations were based on the assumption that an interest synchronization would accompany the equity component. KIC argues the Staff's proposal was interlinked and that the interest synchronization was necessary to avoid a windfall if the hypothetical capital structure was used. KIC also notes the KCC recognized in its initial order that the equity figure would result in excess earnings by WRI and KGE. KIC raised similar arguments in its petitions for reconsideration.

In its initial order adopting Staff's proposed capital structure, the KCC stated that treating some of WRI's debt as if it were equity would give WRI the benefit of greater return on equity and tax benefits arising from a reduced interest deduction. The KCC also noted the interest synchronization might be needed to prevent WRI from collecting through rates income tax expense it would not actually pay. If applied, this adjustment would decrease KGE's revenue requirement by just over $26,000,000 and decrease WRI's revenue requirement by just over $23,000,000. The KCC, however, determined that if the stand-alone utility of this nature did not materialize or materialized for only an insignificant amount of time, the adjustment would not be applied and the interim rates, upon motion, could be made permanent.

Staff's witness, James Proctor, testified that a hypothetical capital structure is used in rate making to estimate the capital structure of a regulated utility when the utility is part of a diversified corporation and it is hard to identify what debt and equity is associated with the utility or when excessive equity is shifted within the diversified corporation to the utility. In this case, Staff's hypothetical capital structure was based on the electric utility's structure prior to recent steps taken by WRI to restructure the corporation for a spin-off and sale of its utility operations. In essence, Staff's figures reversed WRI's actions assigning unsecured senior notes from unregulated segments of WRI to the utility operations and which used the utility's assets to secure a $600 million loan.

To come up with Staff's proposed capital structure, Proctor reviewed the cash-flow of the utility operations to determine long-term debt attributable to the utility rather than the unregulated operations. After determining the appropriate amount of long-term debt directly related to the utility, he determined the common equity component by equating it to the amount of long-term debt *not* related to the utility's operations. One of the options recommended by Proctor was for the KCC to set rates for WRI's electric business based upon Staff's proposed capital structure and to advise the company a post-merger rate case would be conducted to investigate the reasonableness of the utility's rates at that time.

Goodyear argues *Sekan* does not permit a hypothetical capital structure that increases the cost of capital. This argument fails for two reasons. First, this was not raised by any of the parties while before the KCC. Second, Staff's capital structure was based on a cash flow analysis that attempted to ascertain the debt and equity associated with the utility rather than WRI as a whole. Thus, it would seem this proposal was a clear attempt to estimate the actual debt-equity balance of the utility and was designed to ignore WRI's creative corporate restructuring allocations. The capital structure was set up to ensure that the debt-equity balance most closely resembled that directly associated solely with the electric business. Consequently, the cost of capital calculated does not increase the burden on ratepayers beyond the costs reasonably attributable to the regulated utility.

In his testimony, Proctor also discussed interest synchronization. He defined the term as a rate making approach used to determine the interest expense deduction for calculating current state and federal income taxes and to determine the level of interest expense incurred for long-term debt. Staff and Proctor proposed using the utility's *actual* weighted-average cost of long-term debt rather than WRI's *hypothetical* weighted-average cost of long-term debt for determining interest expense.

The interest synchronization issue related to WRI's proposed use of a weighted-average cost of long-term debt that included debt not directly associated with its utility operations. If rates were established based on cost of long-term debt in this fashion, according to Proctor, "[the utility operations'] cost of service *after separation from Westar* will allow for recovery of current state and federal income tax expense which is not incurred"; interest synchronization would be needed to prevent this type of windfall. (Emphasis added.) In his live testimony, Proctor again emphasized the company would receive a windfall without the interest synchronization; the concern with the interest on debt, however, would not arise in the absence of WRI's restructuring plans.

Based upon Proctor's testimony, therefore, it appears both the hypothetical capital structure and interest synchronization were related to WRI's restructuring and efforts to sell the utility operations to the Public Service of New Mexico (PSNM). The hypothetical capital structure was needed because the restructuring shifted WRI's long-term debt, even for unregulated operations, to the electric utility; in developing its capital structure, Staff attempted to undo, on paper, the restructuring effort and limit the long-term debt component to debt actually associated with the utility operations. Staff's witness testified interest synchronization was needed if, in fact, the utility operations became a stand-alone utility and was merged into PSNM. While both issues are related to the restructuring and proposed merger, the record supports the KCC's determination the capital structure adopted did not require interest synchronization *unless* the utility operations became a stand-alone entity in this present form. This is implicitly supported by the fact that Staff, in its petition for reconsideration of the initial

order, did not challenge the KCC's use of its equity figures without the interest synchronization.

We conclude the KCC's order adopting the 44.14% common equity component is supported by substantial competent evidence and its order indicating interest synchronization would occur if a stand-alone utility with a skewed debt-equity ratio materialized for a significant amount of time also is supported by the evidence. While other experts proposed other hypothetical structures, it is for the KCC rather than this court to determine what weight evidence should be given. See *Mobil Exploration & Producing U.S. Inc. v. Kansas Corporation Comm'n*, 258 Kan. 796, 815, 908 P.2d 1276 (1995).

### Revenue and Exclusion of Fuel Costs

KIC also challenges the KCC's treatment of savings and revenues associated with the State Line Electric Generation Plant and the Gordon Evans facilities. The State Line facility, owned by another WRI wholly owned subsidiary, Westar Generating, Inc., began commercial operations in June 2001, approximately 9 months after the end of the test year. The KCC included the fixed costs associated with the plant into WRI's rate base.

KIC argues the State Line Plant is more efficient and will reduce WRI's and KGE's fuel costs because of this efficiency. KIC argues the KCC erred in not recognizing these fuel cost savings and, consequently, the order permits the utilities to recover for fuel costs not actually incurred. KIC also argues the additional generation capacity created by WRI's new generation facilities would lead to a growth in retail sales. Both issues were raised in KIC's petitions for reconsideration before the KCC.

The KCC permitted costs associated with WRI's investment in the Gordon Evans and State Line plants even though the Gordon Evans unit and the State Line plant did not go into commercial service until 9 months after the end of the test year. The KCC also recognized that adjustments should be made to rates for any additional off-system sales, additional customers, and fuel savings associated with the new generation capacity; however, the KCC held the adjustments were appropriate only if they could be reasonably

quantified. While the KCC approved an adjustment for additional off-system wholesale sales, it concluded any adjustments for additional customers and fuel saving were not sufficiently known and measurable. In its order on reconsideration, the KCC simply restated its prior conclusion that "these are not sufficiently known and measurable."

This issue involves inclusion of costs, revenues, and savings attributable to events occurring outside the test year (ending September 30, 2000). In discussing the process of adjusting expenses outside the test year, this court has previously stated:

" 'Ratemaking, by its very nature, is prospective and in order to neutralize the negative effects of speculation and guesswork about future economic conditions, it is accepted practice to base future rates upon known past and present conditions through the use of data gathered during a specified test period. [Citation omitted.] This process of prognostication creates a conflict between the need to lend some finality to ratemaking by utilizing a well-defined, finite test period and the need to base calculations upon the latest available relevant data which often pertains to time periods other than the test period. [Citation omitted.] A satisfactory resolution of this conflict is that when *known and measurable* post-test-year changes affect with certainty the test-year data, *the commission may, within, its sound* discretion, give effect to those changes. [Citation omitted.]' " *Gas Service Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 623, 635-36, 609 P.2d 1157, *rev. denied* 228 Kan. 806 (1980) (quoting *Narragansett Elec. Co. v. Harsch*, 117 R.I. 395, 416, 368 A.2d 1194 [1977]).

Here, the KCC found the fuel cost savings adjustment and the additional customer adjustment supported by KIC were not known and measurable. The KCC argues its determination constitutes a negative finding which cannot be disturbed on appeal absent an arbitrary disregard of undisputed evidence. *Kansas Pipeline Partnership v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 42, 52, 941 P.2d 390, *rev. denied* 262 Kan. 961 (1997). KIC argues the KCC arbitrarily disregarded and rejected the undisputed evidence.

KIC argues the KCC ignored evidence of fuel cost savings from its witness, James Dittmer. Dittmer testified the more efficient State Line would reduce KPL's fuel costs by over $8 million and KGE's costs by approximately $2.6 million. To calculate the projected fuel cost savings, Dittmer calculated the maximum monthly output of the State Line facility at 95% capacity (140,000 megawatt

hours) and assumed this output would displace energy generated from higher cost units based on actual generation during the test year. Dittmer then multiplied the number of megawatt hours he assumed would be generated by the State Line facility by the fuel expense of the higher cost units being displaced. He also calculated the State Line megawatt hours times the annual heat rate of the plant times the projected monthly gas price to determine the fuel costs for the State Line plant. Dittmer concluded the resulting difference represents the total fuel cost savings for WRI. Dittmer assumed, because of lack of data, that 80% of the fuel savings would be attributed to WRI and 20% to KGE and then allocated the savings between wholesale and retail operations based on factors used by the companies to allocate its fuel costs. Dittmer testified his calculations were reasonable and conservative.

Dittmer also testified he annualized revenue WRI and KGE should expect from anticipated customer growth as a result of WRI's and KGE's increased capacity. Dittmer took the average monthly growth in sales from WRI's and KGE's test year and multiplied it by the additional 10 months between the end of the test year and July 2001 to determine additional revenues; he also estimated the fuel and purchased power costs that would be incurred to facilitate these increased customers.

In prefiled rebuttal testimony, James Martin of WRI challenged Dittmer's opinions. Martin indicated Dittmer's fuel savings adjustment was only a "best guess" and did not show known or measurable savings. Martin also challenged the uncertainty of the time frame Dittmer used (midyear 2001) in his projections. Another WRI witness testified that if the KCC stepped outside the test year for fuel cost savings, it would also have to consider increased fuel and purchased power costs due to load growth, increases in the price of coal, and normalizing the utilities' exceptional unit availability performance during the test year. At least one witness testified fuel costs would be affected by factors such as load levels, forced outage rates, and fuel prices.

In rate proceedings, the KCC has discretion to weigh the evidence presented and to accept or reject testimony. *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d 525, 538, 685

P.2d 304, *rev. denied* 236 Kan. 875 (1984). When the KCC is presented with conflicting evidence, this court cannot substitute its judgment in weighing and crediting the evidence. 9 Kan. App. 2d at 539. However, the KCC may not arbitrarily disregard or reject evidence. *Gas Serv. Co. v. Kansas Corporation Comm'n*, 6 Kan. App. 2d 592, 597, 631 P.2d 263, *rev. denied* 230 Kan. 817 (1981).

There is no dispute that fuel savings could be achieved from the operation of the State Line facility if it was used to displace a unit with a higher heat rate. In their cross-examination of Dittmer at the hearing, none of the parties asked questions about his fuel savings or customer growth calculations. In their intervenors' brief, WRI and KGE also relied on a portion of the record citing the affidavit of Shane Mathis to assert that the fuel cost savings, if any, would be offset because the KCC imputed revenue to them for off-systems sales of the excess capacity from the State Line facility. However, Mathis' affidavit was presented after the hearings in WRI and KGE's post-hearing trial brief; the KCC declined to permit WRI and KGE to reopen the record to submit evidence they could have included in their rebuttal evidence prior to the hearings. Therefore, this information is not properly before the court.

Before the KCC, the challenges to Dittmer's calculations were generic and limited. Moreover, the KCC failed to explain why it was rejecting this evidence. Still, Dittmer's calculations were based to some extent on projections and assumptions. Because ratemaking, especially out-of-test-year determinations, are within the discretion of the KCC, it is difficult to conclude the KCC *arbitrarily* ignored this evidence.

An appellate court cannot nullify the Commission's disbelief of evidence nor can it determine the persuasiveness of evidence which the Commission may have believed. *Cf. NEA-Topeka, Inc. v. U.S.D. No. 501*, 225 Kan. 445, 456, 592 P.2d 93 (1979). Negative findings will seldom be set aside if the evidence is limited in quantity and its weight and credibility may be questionable, or if the evidence may be disregarded for any reason. *Brobst v. Brighton Place North*, 24 Kan. App. 2d 766, 779, 955 P.2d 1315 (1997).

Moreover, in *Gas Service Co. v. KCC*, this court recognized that even if an out-of-year adjustment is known and measurable, it is

still somewhat conjectural. This court upheld the KCC's refusal to include an out-of-year adjustment, even though the evidence was uncontroverted as to the program involved and the expense related to it. 4 Kan. App. 2d at 636. In this case, the revenue requirements determined by the KCC were done on an interim basis and subject to refund "until it is determined what will occur with the electric utility and the [KCC] is assured that there will not be an electric utility in financial distress." Because the rates in this case remain interim, future KCC review appears likely. Waiting to see whether, in reality, various changes in operations arise to justify adjustments for fuel cost savings and additional retail customer base does not constitute an abuse of discretion.

### *Intervenors' Briefs*

The briefs filed by the intervenors generally support the arguments and issues raised by KIC. However, in CURB's brief, it challenges the interest rate on a $600 million loan incurred by the WRI's unregulated businesses. CURB contends the interest rate on this loan was improperly included in the embedded cost of debt of WRI and KGE. Likewise, Goodyear and U.S.D. 259 contend the KCC's order is unlawful because it fails to make findings to support its rejection of interest synchronization as required by K.S.A. 77-621(c)(5).

The record reflects that neither CURB nor U.S.D. 259 filed petitions for reconsideration from any of the KCC's orders. Goodyear did not file a petition for reconsideration from the initial order, but it did file one following the KCC's order on reconsideration simply incorporating by reference KIC's petition for reconsideration. Neither CURB, Goodyear, nor U.S.D. 259 filed a petition for judicial review.

Failure to exhaust administrative remedies generally is a bar to judicial review of agency action. *Sandlin v. Roche Laboratories, Inc.*, 268 Kan. 79, 86, 991 P.2d 883 (1999). Whether a party is required to or has failed to exhaust required administrative remedies is a question of law over which appellate review is unlimited. 268 Kan. at 82. The doctrine of exhaustion of administrative remedies is designed to promote proper relationships between the

courts and administrative agencies. The doctrine's foundation is based on a sound consideration of comity and convenience and recognizes the separation of powers doctrine. 268 Kan. at 86.

Here, these intervenors did not exhaust any administrative remedies on the various additional issues they seek to argue. The intervenors will not be permitted to circumvent the exhaustion requirement by attempting to raise issues different from those raised by the party which did exhaust its administrative remedies.

For these reasons, we reject these additional issues not raised or preserved by KIC.

### Conclusion

For all of the foregoing reasons, we conclude KIC is not entitled to relief from the decision of the KCC. The KCC did not err in its adoption of a hypothetical capital structure and its disposition of issues pertaining to revenue requirements were based upon substantial competent evidence.

Affirmed.