(138 P.3d 338)
No. 96,228

KANSAS INDUSTRIAL CONSUMERS GROUP, INC., RAYTHEON AIRCRAFT COMPANY, CESSNA AIRCRAFT COMPANY, BUZZI UNICEM USA, GOODYEAR TIRE & RUBBER COMPANY, COFFEYVILLE RESOURCES REFINING & MARKETING, LLC, SPIRIT AEROSYSTEMS, INC., PROTECTIONONE, INC., THE BOEING COMPANY, and THE KANSAS HOSPITAL ASSOCIATION, *Petitioners/Appellants*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee*.

Opinion filed July 7, 2006.

*James P. Zakoura* and *Arthur E. Rhodes*, of Smithyman & Zakoura, Chartered, of Overland Park, for appellant Kansas Industrial Consumers Group, Inc.

*Scott Ray Ediger, Susan B. Cunningham,* and *Dana A. Bradbury,* of Kansas Corporation Commission, of Topeka, for appellee.

*Martin J. Bregman,* of Westar Energy, Inc. and Kansas Gas and Electric Company, of Topeka, and *Michael Lennen,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for intervenors Westar Energy, Inc. and Kansas Gas and Electric Company.

*Sarah J. Loquist,* of Hinkle Elkouri Law Firm L.L.C., of Wichita, for intervenor Unified School District No. 259.

Before MALONE, P.J., GREEN and CAPLINGER, JJ.

MALONE, J.: The Kansas Industrial Consumers Group, Inc. (KIC), representing large commercial and industrial consumers of electricity, collectively and individually appeal the order of the Kansas Corporation Commission (Commission) approving a net revenue increase for Westar Energy, Inc. (WEI) and Kansas Gas and Electric Company (KG&E) of approximately $3,000,000. The petitioners challenge various aspects of the Commission's order with respect to calculations of the utilities' rates and rate design.

## The Parties

This public utility rate application was filed jointly by WEI and KG&E. Both WEI and KG&E are Kansas corporations. In 1992, WEI's predecessor, The Kansas Power and Light Company (KPL), acquired all the common stock of KG&E. KPL became Western Resources and then WEI. KG&E's operations are concentrated in central and southeastern Kansas, and WEI's operations are concentrated in central and eastern Kansas. Throughout the record, WEI is referred to as Westar North and KG&E as Westar South.

KIC is a corporation whose purpose is to represent, advance, and protect the interests of commercial, industrial, and other large volume users of energy. Throughout the proceeding, KIC represented Cessna Aircraft Company; Raytheon Aircraft Company; Buzzi Unicem USA; Goodyear Tire & Rubber Company; Coffeyville Resources Refining & Marketing, LLC; Spirit AeroSystems, Inc.; ProtectionOne, Inc.; The Boeing Company; and the Kansas Hospital Association. KIC and all the organizations it represented appealed from the final order of the Commission. The Boeing Company, however, has since been dismissed as an appellant.

*The Proceedings Below*

On May 2, 2005, WEI and KG&E (collectively Westar) filed a joint application with the Commission to change their electric utility rates. Westar requested an increase of its revenue requirement for Westar North in excess of $47,800,000 and an increase of its revenue requirement for Westar South in excess of $36,000,000, based upon test year data for the year ending December 31, 2004.

A number of parties were permitted to intervene in the agency proceeding, including the Citizens' Utility Ratepayer Board (CURB) and Unified School District No. 259 (USD 259). KIC was also permitted to intervene after disclosing the entities it was representing. Other intervenors that participated below, but are not involved in this appeal, included the City of Wichita, the Sierra Club, the Kroger Co., the Kansas Power Pool, and the United States Department of Defense.

After the filing of voluminous prefiled testimony by all the parties, the Commission held evidentiary hearings from October 17 to November 3, 2005. The parties were then permitted to file post-hearing briefs setting forth their respective positions on the numerous issues raised during the hearings.

On December 28, 2005, the Commission issued its initial order on Westar's application. The Commission's 127-page order addressed a myriad of issues, resolving some in favor of and many against Westar's rate request. The Commission rejected Westar's request for an aggregated revenue increase of approximately $84,000,000. Instead, the Commission found that Westar North's revenue requirement had increased by $24,207,000, but that Westar South's revenue requirement had decreased by $21,156,550. This resulted in an aggregated revenue requirement increase for Westar of $3,050,494. The Commission estimated the average residential customer's bill in Westar North's service area would increase 5.1%, while the average residential customer's bill in Westar South's service area would decrease 4.8%.

KIC, CURB, and USD 259 filed timely petitions for reconsideration raising numerous issues. The Commission's staff also filed a petition for clarification, and Westar filed a petition for specific

reconsideration, for clarification, and for submission of additional evidence. On February 13, 2006, the Commission granted the staff's request for clarification, but it denied all the remaining issues raised by the parties. The order constituted a final agency action.

KIC and its participating organizations (Petitioners) filed a timely petition for judicial review with this court. Westar and USD 259 intervened. Thereafter, USD 259 and CURB filed separate petitions for judicial review.

### Standard of Review

Pursuant to K.S.A. 66-118c, this court's review of an order of the Commission is in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq*. On appeal, the Commission's findings are presumed valid, and its order may only be set aside if it is unlawful, is not supported by substantial competent evidence, is without foundation in fact, or is otherwise unreasonable, arbitrary, or capricious. *Western Resources, Inc. v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 348, 351, 42 P.3d 162, *rev. denied*, 274 Kan. 1119 (2002). The party challenging the legality of the Commission's order bears the burden of proof pursuant to K.S.A. 77-621(a)(1). *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 28 Kan. App. 2d 313, 315, 16 P.3d 319 (2000), *rev. denied* 271 Kan. 1035 (2001).

This court has previously held that a Commission's order is " 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. [Citation omitted.]" *Farmland Industries, Inc. v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 172, 175, 943 P.2d 470, *rev. denied* 263 Kan. 885 (1997). An order is considered " 'reasonable' if it is based on substantial competent evidence. [Citation omitted.]" 24 Kan. App. 2d at 175. The Commission's action is arbitrary and capricious if it is unreasonable or without foundation in fact. *Farmland Industries, Inc. v. Kansas Corp. Comm'n*, 25 Kan. App. 2d 849, 852, 971 P.2d 1213 (1999).

The Commission is granted broad discretion by the legislature in weighing the competing interests involved in utility rate cases. The court does not have the authority to substitute its judgment

for that of the Commission. The court must recognize that the Commission's decisions "involve complex problems of policy, accounting, economics, and other special knowledge." *Western Resources, Inc.*, 30 Kan. App. 2d at 352. The court may reverse or nullify a Commission order only when the decision is " ' "so wide of the mark as to be outside the realm of fair debate. [Citations omitted.]" ' " *Williams Natural Gas Co. v. Kansas Corporation Comm'n*, 22 Kan. App. 2d 326, 335, 916 P.2d 52, *rev. denied* 260 Kan. 1002 (1996).

### Retail Energy Cost Adjustment

In their first issue on appeal, Petitioners challenge the Commission's order permitting Westar to include a retail energy cost adjustment (RECA) in its rates. Westar had proposed to include a RECA, which would be calculated based on a fuel adjustment charge less an off-systems sales adjustment. The primary purpose of any type of energy cost adjustment (ECA) clause is to pass through to the consumer any increases or decreases in the cost of energy, while avoiding the costly and time-consuming process of a formal hearing to consider a general revision to all rates.

Petitioners contend the Commission's order altered its 1991 merger order, discussed below, and there was not substantial competent evidence to support the Commission's deviation from that prior order. Petitioners contend no evidence was presented that the effects of the merger had changed to warrant reinstatement of the pass-through provision. Petitioners also contend the Commission failed to explain the basis for its change in position.

In 1991, KPL and KG&E merged into a single entity known as KPL. Their merger was presented to the Commission for approval in KCC Docket Nos. 172,745-U and 172,155-U. In a 110-page order issued November 15, 1991, the Commission approved the merger subject to various conditions. The Commission discussed numerous arguments various parties had made against the proposed merger. However, none of the parties appeared to have raised any concern about the utilities' ECA clauses in their existing rates. The Commission's primary focus in the merger order was the proper method in treating the acquisition premium paid by

KPL to KG&E shareholders, whether the benefits of the merger would outweigh merger costs and result in a benefit to ratepayers, and how cost savings should be divided between ratepayers and shareholders.

The first mention of the ECA clauses was raised *sua sponte* by the Commission in discussing an appropriate tracking system that would verify cost savings achieved by the merger. The Commission rejected the utilities' proposed tracking system and instead ordered that an index mechanism be created based upon normalized premerger test year costs to act as a benchmark for the premerger costs and expenses. In addition, the benchmark would be adjusted annually for inflation and for known changes in tax laws or regulatory rules. This adjusted benchmark would be used to measure against postmerger costs to determine what cost savings, if any, had developed from the merger. In setting the benchmark, the Commission determined the cost measurements would exclude various items including fuel, purchased gas, and purchased power costs.

Later in the order, the Commission stated:

"It should be noted that we have excluded fuel and purchased gas and purchased power costs from the indexing mechanism. This is for two separate reasons and requires elaboration. Purchased gas costs were not projected to be affected by the merger and will continue to be subject to a Purchased Gas Adjustment (PGA) clause in KPL's gas tariffs. Due to the changes occurring in the gas industry, driven in large part by new and proposed Federal Energy Regulatory Commission rules, there is some uncertainty concerning gas prices so that changes in the PGA would not be reasonable at this time.

"However, the Commission has decided *to take this opportunity to require the Applicants to eliminate their respective Energy Cost Adjustment (ECA) clauses* contained in their tariffs for electric service. *In the last several years, the Commission has approved of such ECA elimination for other electric utilities and believes it an appropriate time to do the same for KPL and KGE.* These clauses, instituted in the mid-1970s, were designed to allow for monthly adjustments in the fuel and purchased power components of the cost of electricity. *Such monthly adjustments were appropriate because of the rapid escalations and fluctuations in the costs of fuel at the time. . . . Since fuel costs are now much more stable and the Commission desires to provide additional incentives to the utilities to manage their costs as efficiently as possible, it has been eliminating the ECAs on a case-by-case basis as the opportunity arose.*

"We are therefore directing the Applicants, staff and any other interested party to discuss how the Applicants' respective ECAs should be eliminated. The Com-

mission directs staff to initiate a separately docketed proceeding *to consider* the elimination of Applicants' energy cost adjustment clauses . . . ." (Emphasis added.)

In its conclusion, the Commission found the merger would serve the public interest and approved the merger subject to various conditions. With respect to a number of the listed conditions, the Commission explicitly stated in each paragraph that "[t]he merger will be approved on the condition that . . .," or some substantially similar language. With respect to the elimination of the ECA clauses, however, the merger order merely stated: "The Commission directs staff to initiate a separately-docketed proceeding to consider the elimination of Applicants' energy cost adjustment clause" and set guidelines for that docket. Finally, the Commission unequivocally reserved the right to modify or revoke the conditions imposed in the merger order:

"It should be noted that many of the conditions set forth above are efforts to achieve a fair and reasonable balance between the Applicants' requirements for a successful merger and the interests of ratepayers in receiving reasonable benefits from the merger. Of most importance, however, is the Commission's continuing duty to ensure that utility rates are just and reasonable. *If the various conditions we have set forth above, either singly or in combination with one another, appear to result in unreasonable or unjust rates, the Commission will not hesitate to modify or revoke that condition or otherwise act to ensure that rates are reasonable and that neither Applicants nor ratepayers receive unwarranted benefits or detriments.*" (Emphasis added.)

Pursuant to the Commission's directive, an independent docket—No. 92,KPLE-228-ECA—was opened in 1992 to evaluate the elimination of KPL/KG&E's ECA clauses. Staff and KPL/KG&E ultimately entered into a stipulation and agreement which stated that "[a]mong the conditions [for the merger] were the elimination of the Energy Cost Adjustment Clauses (ECAs) of KPL and KG&E . . . ." In considering the stipulation and agreement, the Commission indicated that in the prior merger order it had "ordered KPL and KGE to eliminate their ECAs and replace them with a fixed fuel cost." The order further noted that another docket was pending to review whether the ECA clauses contained in Kansas electric utilities' rates should be eliminated. Thereafter, the

Commission approved the stipulation and agreement without specifically indicating it was a condition of the merger order.

Returning to the present case, Petitioners contend the Commission's ruling "reinstating" Westar's RECA clause is contrary to the terms of the 1991 merger order. Petitioners assert there was no evidence in the present hearings establishing that the effects of the merger warranted the reinstatement. In response, the Commission asserts the 1991 elimination of the ECA clauses was not a "condition" of the merger. The Commission also contends a change of circumstances, especially the volatility of fuel prices, warrants reinstatement of an ECA clause.

Generally, administrative agencies may change positions on an issue if the new position is supported by substantial competent evidence. However, when an administrative agency deviates from a policy it had adopted earlier, it must explain the basis for the change. *Western Resources, Inc.,* 30 Kan. App. 2d 348, Syl. ¶ 7. Likewise, the process by which an administrative agency reaches its decision must be logical and rational, especially if the agency is deviating from its prior standards. *Home Telephone Co. v. Kansas Corporation Comm'n,* 31 Kan. App. 2d 1002, 1012, 76 P.3d 1071 (2003), *rev. denied* 277 Kan. 923 (2004).

The Commission's assertion—that the elimination of the ECA clauses in 1991 was not a condition of the merger—is consistent with the structure and language of the 1991 merger order. Although many parties involved in that docket were opposed to the merger, none appear to have advocated that eliminating the ECA clauses was necessary if the merger was approved. Instead, the elimination was raised *sua sponte* by the Commission because the proceeding "presented the opportunity" to bring KPL/KG&E into conformance with an overall industry trend of eliminating ECA clauses due to stability in fuel prices." '[A]n agency's interpretation of the intended effect of its own orders is controlling unless clearly erroneous.' " *Southwest Gas Corp. v. FERC,* 145 F.3d 365, 370 (D.C. Cir. 1998) (quoting *Transcontinental Gas Pipe Line Corp. v. FERC,* 922 F.2d 865, 871 [D.C. Cir. 1991]). The Commission's interpretation of its prior merger order is supported by the record and is consistent with the language of that order.

Even if elimination of KPL/KG&E's ECA clauses had been an explicit "condition" of the merger order, the 1991 Commission expressly reserved the right to revoke or modify any of the conditions imposed if they resulted in unreasonable or unfair rates in the future. Contrary to Petitioners' position, modification of the merger conditions did not require proof *that circumstances tied to the merger* had changed. Instead, the standard for modification was whether the conditions resulted in unfair or unreasonable rates. *Cf. Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 5 Kan. App. 2d 653, 661, 623 P.2d 924, *rev. denied* 229 Kan.670 (1981) (presumption of validity of previously approved rate structure simply meant that under the conditions then existing, the structure was "just and reasonable").

In its posthearing brief filed with the Commission, Petitioners vigorously disputed the need for the RECA provision in Westar's rates. On appeal, however, Petitioners do not directly challenge the Commission's finding that current fuel prices had returned to a volatile and fluctuating state that warranted the inclusion of a RECA mechanism in rates. Thus, Petitioners have abandoned any contention that the evidence did not support the economic need for the RECA provision. See *Goldbarth v. Kansas State Board of Regents,* 269 Kan. 881, 884, 9 P.3d 1251 (2000) (issue not briefed is deemed waived or abandoned). Accordingly, we conclude KIC has failed to meet its burden of establishing the Commission's order with respect to the RECA was unreasonable, arbitrary, or capricious. See *Southwestern Bell Tel. Co. v. Kansas Corporation Comm'n,* 29 Kan. App. 2d 414, 418, 29 P.3d 424 (2001) (the burden of proving the invalidity of an order of the Commission is on the party asserting the invalidity).

In the alternative, Petitioners contend the Commission exceeded its statutory authority by permitting Westar to include the RECA in its rates. Specifically, Petitioners contend the energy pass-through provisions constitute a rate change without a full rate hearing as required by K.S.A. 66-117. In response, the Commission relies on its broad statutory authority under K.S.A. 66-101 and K.S.A. 66-101g to support its action. In K.S.A. 66-101, the Commission is "given full power, authority and jurisdiction to supervise

and control the electric public utilities . . . and is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction." In K.S.A. 66-101g, the legislature stated that with respect to the regulation of electric public utilities: "[T]he provisions of this act and all grants of power, authority and jurisdiction herein made to the commission, shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of this act are expressly granted to and conferred upon the commission."

Generally, administrative agencies such as the Commission, as creatures of statute, may only act within the scope of authority granted by their authorizing statutes. *Legislative Coordinating Council v. Stanley*, 264 Kan. 690, 706, 957 P.2d 379 (1998). Whether an agency has exceeded its statutory authority requires interpretation of the statutes establishing the agency. This presents a question of law subject to unlimited review by an appellate court. *In re Tax Appeal of Trickett*, 27 Kan. App. 2d 651, 656-57, 8 P.3d 18 (2000).

The procedure to implement a public utility rate change is generally set forth at K.S.A. 66-117, which provides in part:

"(a) *Unless the state corporation commission otherwise orders,* no common carrier or public utility over which the commission has control shall make effective any changed rate, joint rate, toll, charge or classification or schedule of charges, or any rule or regulation or practice pertaining to the service or rates of such public utility or common carrier *except by filing the same with the commission at least 30 days prior to the proposed effective date.* The commission, for good cause, may allow such changed rate, joint rate, toll, charge or classification or schedule of charges, or rule or regulation or practice pertaining to the service or rates of any such public utility or common carrier to become effective on less than 30 days' notice." (Emphasis added.)

Contrary to Petitioners' assertion, K.S.A. 66-117 does not require, on its face, every change in rates to be approved in a full-blown rate hearing. The statute begins: "Unless the state corporation commission otherwise orders." In allowing the RECA provision in this case, the Commission established a regulatory framework to review Westar's monthly RECA prices and the annual cost adjustment (ACA) factor. The ACA factor adjusts the past

monthly projected RECA costs with the actual costs incurred during the prior year. The ACA analysis includes a review of performance of plants, Westar's purchasing practices, and fuel procurement practices. This analysis provides an incentive to Westar to operate efficiently.

Furthermore, the Commission has been authorizing both natural gas and electric utilities to use ECA or purchased gas adjustment (PGA) clauses for a many years. These provisions have been addressed in a number of appellate cases. See, *e.g.*, *Farmland Industries, Inc. v. Kansas Corporation Comm'n*, 29 Kan. App. 2d 1031, 1044, 37 P.3d 640 (2001), *rev. denied*, 274 Kan. 1111 (2002) (when natural gas wholesaler receives a refund from upstream producers or pipelines, PGA clauses require those refunds to be passed on to current customers); *Greeley Gas Co. v. Kansas Corporation Commission*, 15 Kan. App. 2d 285, 288-89, 807 P.2d 167 (1991) (Commission violated filed rate doctrine by imposing the PGA 80/20 incentive tariff, allowing utility to only pass through 80% of any increase in its gas costs and, likewise, only 80% of any decrease in gas costs); *Kansas Gas & Electric Co. v. Kansas Corp. Comm'n*, 14 Kan. App. 2d 527, 536-37, 794 P.2d 1165, *rev. denied* 247 Kan. 704 (1990) (Commission must comport with ECA clause when calculating customer refunds; failure to do so results in retroactive ratemaking); *Midwest Gas Users Ass'n*, 5 Kan. App. 2d at 654 (increased cost of gas to utility was not involved in rate increase because it is automatically passed through to consumers by means of a PGA).

Despite the Commission's long-established use of ECA clauses, no party in these cases has ever challenged the Commission's statutory authority to include such provisions in utility rates. " 'When the legislature fails to modify a statute to avoid a standing judicial construction of that statute, the legislature is presumed to agree with the court's interpretation.' [Citation omitted.]" *Halsey v. Farm Bureau Mut. Ins. Co.*, 275 Kan. 129, 136, 61 P.3d 691 (2003). A similar principle arises in connection with the doctrine of operative construction. Many courts have acknowledged that a longstanding administrative interpretation of a statute should not be overruled except for weighty reasons. See *In re Tax Appeal of Federal Deposit*

*Ins. Corp.*, 249 Kan. 752, 764, 822 P.2d 627 (1991); see also *SEC v. Zandford*, 535 U.S. 813, 819-20, 153 L. Ed. 2d 1, 122 S. Ct. 1899 (2002) (consistent interpretation of § 10[b] of the Securities Exchange Act and SEC Rule 10b-5 by SEC in formal adjudication is entitled to deference if reasonable); *Aulston v. United States*, 915 F.2d 584, 596 (10th Cir. 1990), *cert. denied* 500 U.S. 916 (1991) (adopting the Department of Interior Board of Land Appeals' longstanding interpretation of federal laws pertaining to federal land patents).

We conclude the Commission's interpretation of its statutory authority with respect to permitting ECA clauses is consistent with the plain language of the authorizing statutes. Moreover, the use of ECA clauses is a longstanding agency practice that neither the courts nor the legislature have seen fit to question, limit, or abrogate.

Additionally, Petitioners challenge the RECA provision allowed in Westar's rates on the ground it failed to conform to standardized ECA provisions the Commission created in 1977. K.S.A. 66-118b provides that a party seeking review of a Commission order must petition for reconsideration of that order as set forth in K.S.A. 2005 Supp. 77-529. A party may not rely upon any ground in a court proceeding that was not included in the petition for reconsideration. Any issue not set forth in the petition for reconsideration cannot be relied upon in judicial review proceedings. *Kansas Industrial Consumers v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 332, 338, 42 P.3d 110 (2002).

In this case, Petitioners did not raise the issue of the Commission's lack of compliance with the 1977 order in Petitioners' post-hearing briefs or their petition for reconsideration. Petitioners do not justify their failure to previously raise this issue below or explain why this court should address the issue for the first time on appeal. Accordingly, Petitioners have failed to properly preserve this issue.

*Environmental Cost Recovery Rider*

Next, Petitioners take issue with the Commission's order permitting Westar to include an environmental cost recovery rider (ECRR) in its rates. In its prefiled testimony, Westar estimated its

total capital expenditures over the next 10 years for environmental compliance upgrades would exceed $453 million. In its rate application, Westar sought permission to include an ECRR to recover its costs. Westar's proposal would allow the utility to collect from customers a monthly surcharge to recover capital costs, construction work in progress (CWIP) costs, and operating and maintenance expenses associated with installing new pollution control equipment. The ECRR would be calculated yearly based on the prior calendar year's year-end costs. Using an ECRR, Westar could recover the revenue requirement associated with these expenses through a surcharge until the next rate case. In the next rate case, those costs would then be included in base rates.

In its order, the Commission found the ECRR was a reasonable mechanism for "funding the extraordinary costs mandated" by federal environmental laws. The Commission approved a modified version of Westar's request which excluded operating and maintenance expenses from the ECRR and added oversight by the Commission's staff to ensure the investments in environmental upgrades were prudent. The approved program requires Westar to file a summary of each capital project at least 6 months before work is commenced. Thereafter, a true-up mechanism would be used to ensure only costs actually expended would be collected. The Commission concluded that prompt recovery of ECRR costs would result in lower retail cost of service for ratepayers, and approved the provision as modified.

Similar to one of the objections Petitioners raised with respect to the RECA pass-through provision, Petitioners contend the Commission exceeded its statutory authority by permitting Westar to include the ECRR in its rates. Petitioners assert the Commission's statutory authority to permit surcharges is limited to K.S.A. 66-117(f) (surcharges for ad valorem taxes), K.S.A. 66-1233 (expenses related to protective security measures), and K.S.A. 2005 Supp. 66-1237 (transmission-related charges). Petitioners contend that, under the doctrine of *expressio unius est exclusio alterius, i.e.,* the inclusion of one thing implies the exclusion of another, the legislature's action in permitting surcharges for specific types of expenses infers an intent not to permit surcharges for expenses not

specifically authorized by statute. In response, the Commission contends the *expressio unius* doctrine does not apply because of the broad generic powers the legislature granted it in K.S.A. 66-101 and K.S.A. 66-101g. It also asserts the statutes that specifically provide for surcharges actually were designed to limit the Commission's discretion rather than to grant additional authority that the Commission did not previously possess.

The *expressio unius* doctrine may be applied to assist in determining actual legislative intent which is not otherwise manifest, although the doctrine should not be employed to override or defeat a clearly contrary legislative intention. *In re Marriage of Killman*, 264 Kan. 33, 42, 955 P.2d 1228 (1998). The extent to which the doctrine should be applied depends in any event on how clearly the drafter's intent is otherwise expressed. *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 662, 876 P.2d 1362 (1994).

Federal courts are reluctant to apply the *expressio unius* doctrine in the administrative law context. As noted by the District of Columbia Circuit Court of Appeals:

"[W]e have rejected the [*expressio unius*] canon in some administrative law cases, but only where the logic of the maxim-that the special mention of one thing indicates an intent for another thing not be included elsewhere-simply did not hold up in the statutory context. [Citations omitted.] As we have noted, if there are other reasonable explanations for an omission in a statute, *expressio unius* may not be a useful tool. [Citation omitted.] But, where the context shows that the 'draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives,' the canon is a useful aid." *Independent Ins. Agents of America, Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000).

Likewise, federal courts are especially reluctant to apply the doctrine when defining the authority of a regulatory agency. See *Texas Office of Public Utility Counsel v. F.C.C.*, 183 F.3d 393, 443-44 (5th Cir. 1999) ("[T]he combination of the FCC's 'necessary and proper' authority under [47 U.S.C.] § 154[i] and the limited usefulness of the *expressio unius* doctrine in the administrative context permit the FCC to expand the reach of universal support to non-telecommunications carriers.").

As the Commission notes, the Kansas Supreme Court has held K.S.A. 66-101 and K.S.A. 66-101g are a constitutional delegation of legislative authority. See *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 495, 720 P.2d 1063 (1986) (the requirement that the Commission set forth findings of fact and conclusions of law and permit judicial review forestalls the risk of arbitrary action by the Commission). Based on the broad statutory authority granted to the Commission, the *expressio unius* doctrine does not appear applicable with respect to determining legislative intent. We conclude the Commission did not exceed its statutory authority by permitting Westar to include the ECRR in its rates.

Normally, capital costs for new plants, generators, or other facilities are allowed into rates only when they become "used and required to be used" in services to the ratepayers. See K.S.A. 2005 Supp. 66-128 (property that has not been completed and dedicated to commercial service shall not be deemed used and required to be used in services to the public except under specific circumstances); *Kansas Power & Light Co. v. Kansas Corporation Commission*, 5 Kan. App. 2d 514, 523, 620 P.2d 329 (1980), *rev. denied* 229 Kan. 670 (1981) (inclusion of expenses related to construction work in progress [CWIP] is discretionary with the Commission under 66-128). In this case, however, one of the Commission's staff witnesses testified that the anticipated environmental projects were exempt from K.S.A. 2005 Supp. 66-128, either because the projects were additions to electric facilities after January 1, 2001, or because the projects would be completed in less than a year. This testimony was uncontroverted in the record. The Petitioners do not dispute the Commission's finding that the environmental upgrades will not necessarily enhance the production of electricity. Moreover, there was evidence that ratepayers would receive some benefit if the environmental expenses were recovered through a surcharge rather than being added to the rate base after the projects were completed. Finally, the evidence indicated the ECRR projects would be subject to review by the Commission's staff for prudence and necessity and a true-up mechanism would be used to ensure only costs actually expended would be recovered. The record con-

tains no compelling evidence to justify reversing the Commission's order concerning the ECRR provision.

### Transmission Delivery Charge

Next, Petitioners take issue with the Commission's order permitting Westar to invoke K.S.A. 2005 Supp. 66-1237 to include a transmission delivery charge (TDC) in its rates. K.S.A. 2005 Supp. 66-1237 was enacted in 2003, and Westar is the first public utility to attempt to include a TDC in its rates. Petitioners' challenge is threefold. First, Petitioners assert the statute does not permit an initial TDC to be determined in a pending rate proceeding. Second, Petitioners assert the use of a tentatively approved Federal Energy Regulatory Commission (FERC) rate to calculate the TDC is impermissible. Finally, Petitioners contend the Commission failed to satisfy the "revenue neutral" provision of the final sentence of the statute.

K.S.A. 2005 Supp. 66-1237 provides, in part:

"(a) Any electric utility subject to the regulation of the state corporation commission . . . may seek to recover costs associated with transmission of electric power, *in a manner consistent with the determination of transmission related costs from an order of a regulatory authority having legal jurisdiction*, through a separate transmission delivery charge included in customers' bills. *The electric utility's initial transmission delivery charge resulting from this section shall be determined by the commission from transmission-related costs approved in the electric utility's most recent retail rate filing.* If an electric utility elects to recover its transmission-related costs through a transmission delivery charge, the commission shall, effective the same date as the effective date of the initial transmission delivery charge, reduce the electric utility's retail rates to such a level that the sum of the revenue recovered from such retail rates and the initial transmission delivery charge is equal to the revenue recovered from the retail rates *in effect immediately prior to the effective date of the initial transmission delivery charge.*" (Emphasis added.)

In its rate application, Westar originally proposed to implement a TDC based on its formula transmission rate then pending before FERC. This proposal would allow Westar to "unbundle" its transmission rate by taking it out of base rates and assessing a separate charge on its customers' bills. According to the proposal, Westar would remove its transmission and related costs from its total embedded cost of service. In a May 2, 2005, filing with FERC, Westar

proposed a formula to allocate transmission costs between whole-sale and retail customers and between different classes of retail customers. At the time of the Commission's hearing, Westar's existing transmission revenue requirement and rates had been adopted in March 1998 and were based on a 1994 test year.

The Commission's staff originally objected to Westar's proposed TDC because of various perceived errors in the company's rate calculations and the need to ensure all transmission or related costs were removed from Westar's cost-of-service analysis for retail rates. The Commission's staff noted that Westar's proposal based the TDC on proposed rates which FERC had not yet approved. It further noted the rates should contain an adjustment mechanism to reflect the rates that FERC eventually approved and the Commission should "leave the matter of adjustment open for future Commission determination after FERC issues its final order."

Later, the Commission's staff and Westar filed a stipulation and agreement with respect to Westar's requested TDC. The parties agreed to remove the cost of service associated with transmission from Westar's overall revenue requirement and also to remove wholesale transmission revenues from the company's income. The method for calculating these figures was based on a formula "expected to be authorized by the FERC." The stipulation provided that the TDC revenue requirement would be recovered "consistently with the transmission rate *proposal* at the FERC, subject to adjustments to reflect the rates that the FERC ultimately approves." (Emphasis added.) Recognizing that the rates contained in Westar's FERC application were subject to refund, the stipulation established a procedure for passing through any FERC-ordered refunds that might arise. The stipulation specifically did not include an annual true-up mechanism, but stated it did not preclude either party from proposing such a mechanism "in future proceedings." The Commission approved the stipulation and agreement.

Petitioners initially assert the references in K.S.A. 2005 Supp. 66-1237(a) to "approved" costs and "retail rates in effect immediately prior to the effective date" of the initial TDC prevent the Commission from approving an initial TDC in an ongoing rate

proceeding. In response, the Commission concedes that the statute was poorly drafted and that it was simply implementing the TDC provision in the most practical fashion. The Commission argues its order should be permitted because it carries out the spirit of the statute and the intent of the legislature.

The interpretation of a statute by an administrative agency which is charged with the responsibility of enforcing that statute is generally entitled to judicial deference, and if there is a rational basis for the agency's interpretation, it should be upheld on judicial review. *Southwestern Bell Tel. Co. v. Kansas Corporation Comm'n,* 29 Kan. App. 2d 414, 418, 29 P.3d 424 (2001). Although this court gives deference to the agency's interpretation of a statute, the final construction of a statute lies with the appellate court. The agency's interpretation, while persuasive, is not binding on the court. *In re Appeal of United Teleservices, Inc.,* 267 Kan. 570, 572, 983 P.2d 250 (1999).

A clear and unambiguous statute must be given effect as written. If a statute is clear and unambiguous, then there is no need to resort to statutory construction or employ any of the canons that support such construction. *State v. Robinson,* 281 Kan. 538, 540, 132 P.3d 934 (2006). A statute is ambiguous when " 'the face of the statute leaves its construction uncertain.' [Citations omitted.]" *Rose v. Via Christi Health System, Inc.,* 279 Kan. 523, 526, 113 P.3d 241 (2005). Only when an ambiguity exists may the court look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. 279 Kan. at 526.

" 'Although *the courts can only interpret a statute as framed, notwithstanding difficulties in its application,* a construction of an *ambiguous statute* should be avoided which would render the application of the statute impracticable, or inconvenient, or which would require the performance of a vain, idle, or futile thing, or attempt to require the performance of an impossible act.' [Citation omitted.]" (Emphasis added.) *In re Adoption of Baby Boy L.,* 231 Kan. 199, 209, 643 P.2d 168 (1982).

A careful review of K.S.A. 2005 Supp. 66-1237(a) reflects the terms are, for the most part, clear. The last sentence of the statute

requires that the TDC be revenue neutral with the "retail rates in effect immediately prior to the effective date" of the initial TDC. Requiring revenue neutrality with past transmission rates perhaps reflects a legislative assumption that TDC proceedings would likely occur outside a standard rate case. However, the statute also provides that the initial TDC shall be determined based upon transmission related costs approved in the utility's "most recent retail rate *filing*." This language requires the costs to be approved, but does not mandate that the approval occur in a *prior* order or proceeding—it need only occur in the most recent *filing*. Thus, K.S.A. 2005 Supp. 66-1237(a) does not prevent the Commission from approving an initial TDC in an ongoing rate proceeding.

Next, Petitioners take issue with the calculation of the TDC based on a FERC wholesale rate and formula which is not final. K.S.A. 2005 Supp. 66-1237(a) allows an electric utility to recover costs associated with the transmission of electric power "in a manner consistent with *the determination of transmission related costs from an order of a regulatory authority having legal jurisdiction.*" (Emphasis added.) FERC has jurisdiction to address rates for the transmission of electrical power and interstate sales of electrical power. See 16 U.S.C. § 824 (2000); see also Kansas legislative hearings statements of CURB representative prior to enactment of 66-1237(a): Minutes, Sen. Utilities Comm., March 10, 2003 (H.B. 2130); Minutes, House Utilities Comm., February 5, 2003 (H.B. 2130) (indicating an assumption this language referred to FERC).

However, the statute also states the initial TDC shall be determined based on "transmission-related costs *approved* in the electric utility's most recent *retail* filing." (Emphasis added.) K.S.A. 2005 Supp. 66-1237(a). The Commission, not FERC, has jurisdiction to determine retail rates for regulated industries. See *Farmland Industries, Inc. v. Kansas Corporation Comm'n*, 29 Kan. App. 2d 1031, 1036-37, 37 P.3d 640 (2001) (while FERC controls wholesale gas prices and transport issues, state agency controls retail issues). Thus, the TDC must be calculated on approved rates from a retail filing, but they also must be consistent with FERC orders. See K.S.A. 2005 Supp. 66-1237(a).

The procedures at FERC differ significantly than those at the Commission. For example, FERC has statutory authority to "suspend the operation . . . and defer the use" of a proposed rate for up to 5 months. Thereafter, the rate "shall go into effect," but "[FERC] may, by order, require the [utility] . . . to refund any amounts" later found by [FERC] to be unjust and unreasonable. 15 U.S.C. § 717c(e) (2000) (applied to natural gas companies); *see also* 16 U.S.C. § 824d(e) (2000) (permitting FERC to suspend proposed rate change for 5 months before it goes into effect; effective rate may be collected until completion of hearing and decision subject to refund, with interest). These statutes are an exception to the rule prohibiting retroactive rate changes but are considered " 'a necessary compromise to accommodate delays in the approval process.' [Citation omitted.]" *ChevronTexaco Exploration & Production v. F.E.R.C.*, 387 F.3d 892, 897 (D.C. Cir. 2004). Under federal cases, rates allowed subject to refund are deemed "effective" but are not approved rates and the company bears the risk the "effective" rates will not be fully approved. *East Tennessee Natural Gas Co. v. F.E.R.C.*, 863 F.2d 932, 942 (D.C. Cir. 1988).

In contrast to FERC methods and practices, the Commission has no explicit statutory authority to allow rates to go into effect subject to refund. K.S.A. 66-117(c) gives the Commission the authority to suspend proposed rates for up to 240 days. If a *final* order is not issued within that period (with a few exceptions), the rates are deemed *approved*. K.S.A. 66-117(c). The time delays for FERC proceedings can be notoriously long, as noted by this court in *Farmland Industries, Inc.*, 29 Kan. App. 2d at 1033 (detailing FERC process regarding recoverability of ad valorem taxes from 1983 to 1997 which percolated through the federal courts as well). A Commission staff witness acknowledged that while FERC accepted the rates subject to refund, FERC had no deadline to reach a final order on Westar's proposed rates. The witness stated that "[p]otential litigation of other issues may result in lengthy hearings, thus adding to the time before FERC issues a final order."

Because the TDC calculated by the Commission is based on the "effective" interim FERC rate and contains a refund mechanism, the TDC appears consistent with the FERC interim order. How-

ever, the TDC is also based on transmission-related costs "approved" by the Commission in the current retail rate filing, but those costs are not final because the FERC order is not final. In this respect, the TDC does not comport with K.S.A. 2005 Supp. 66-1237(a). Moreover, because Westar has chosen to seek the TDC in a rate proceeding under K.S.A. 66-117, it is logical that the rates must also comport with that statute. Allowing Westar to collect a rate subject to refund in the future based upon a FERC ruling which may be months in the making is inconsistent with the general requirement that a final order be entered within 240 days. Westar and the Commission could have calculated the TDC based upon a FERC rate which was finally approved and not subject to refund, but instead Westar chose to implement a TDC based on a formula transmission rate then pending before FERC.

Finally, Petitioners contend the Commission failed to satisfy the "revenue neutral" provision of the statute. Under the final sentence of K.S.A. 2005 Supp. 66-1237(a), if a TDC is allowed, the total amount of the TDC plus revenue recovered from the retail rates must equal "the revenue recovered from the retail rates in effect *immediately prior to* the effective date of the initial transmission charge." (Emphasis added.) We agree with the Petitioners that the Commission failed to satisfy this statutory requirement.

Based on the record and arguments of the parties, it appears the Commission adopted the TDC stipulation and agreement based on calculations that the TDC plus the new retail rates being approved in this case were revenue neutral with what *the new rates would have been with the transmission delivery costs included in the rates*. There is evidence that this "revenue neutral" aspect was to a large degree speculative due to the problems with the interim FERC rates and ordinary differentials between wholesale and retail rate mechanisms. Still, it appears the Commission based its "revenue neutral" finding regarding the TDC on the revenue recovered from the *new rates* it was approving in this case, not the revenue recovered from the "retail rates *in effect immediately prior to* the effective date of the initial transmission charge." Clearly, the retail rates approved in the present proceeding were not "in effect prior to" the effective date of the initial TDC.

This goes back to the problem of Westar attempting to implement its initial TDC in a pending rate proceeding. Although the application was not prohibited by K.S.A. 2005 Supp. 66-1237(a), the statute presented problems in implementing Westar's request. The Commission argues that its actions were an attempt to carry out the intent of the legislature, *i.e.*, at the end of the day the new rates approved in this case plus the TDC equaled what the new rates would have been with the transmission delivery costs included in the rates. Nevertheless, the Commission acknowledges that its order calculating the TDC does not comport with the actual provision of the statute.

"[T]o depart from the clear meaning expressed by statutory language is to alter the statutes, to legislate and not to interpret. [Citation omitted.]" *In re Petition of City of Shawnee for Annexation of Land*, 236 Kan. 1, 14, 687 P.2d 603 (1984). It is not the court's function to rewrite otherwise clear statutes. *State v. Marsh*, 278 Kan. 520, 539, 102 P.3d 445 (2004), *cert. granted* 544 U.S. 1060 (2005); *Natalini v. Little*, 278 Kan. 140, 144, 92 P.3d 567 (2004); see also *Trees Oil Co. v. Kansas Corporation Comm'n*, 279 Kan. 209, 239, 105 P.3d 1269 (2005) (Luckert, J., dissenting) ("[I]t is inappropriate for this court or the KCC to delete a word or phrase from a statute if doing so would rewrite an unambiguous statute.").

Here, the TDC is based on a FERC wholesale rate which is not final, contrary to the requirements of K.S.A. 66-117 and K.S.A. 2005 Supp. 66-1237(a). Also, the parties can point to no evidence of the use of prior rates as the measure for revenue neutrality in calculating the TDC as required by K.S.A. 66-1237(a). Accordingly, the Commission's order, no matter how sound its reasoning, is contrary to the statutory provisions and must be reversed.

### Terminal Net Salvage Depreciation

Petitioners also take issue with the Commission's order permitting Westar to depreciate its facilities by including "terminal net salvage" costs adjusted for inflation. In its order, the Commission calculated depreciation by determining the loss in service value of the plants. In reaching this loss in service value, the Commission determined the cost to completely dismantle plant facilities sub-

tracted from the salvage value of the plant assets. This was referred to as "terminal net salvage depreciation." Using a terminal net salvage calculation has the effect of increasing depreciation expense, thereby increasing the company's revenue requirement. The use of terminal net salvage depreciation increased Westar's revenue requirement by $29 million from the 2000-2001 approved rates.

Petitioners argue there was not substantial competent evidence to support the use of terminal net salvage depreciation because there was no evidence Westar had or ever planned to completely dismantle any of its retired facilities. Accordingly, they contend the inclusion of terminal net salvage depreciation was speculative. Petitioners also contend the inflation adjustment adopted by the Commission was not supported by substantial competent evidence.

The evidence before the Commission on this issue was highly contentious. In its rate application, Westar relied upon the testimony of John Spanos, who conducted depreciation studies for Westar's plants. Spanos had been interviewed by both Westar and the Commission's staff, which had agreed Westar could hire Spanos. In making his calculations, Spanos examined Westar's recorded plant transactions from 1990 to 2003. Spanos visited representative portions of plants for both Westar North and Westar South. In ascertaining net salvage values to determine depreciation, Spanos "estimated" the dismantling costs at all steam generation stations based upon costs derived from dismantling studies of "other similar stations." Spanos determined net salvage value of all steam production facilities, determined when facilities would likely be retired, and then applied an inflation factor of 3% per year to current salvage costs to determine the likely salvage cost at the time of retirement.

Spanos testified there is a growing demand for electric power and fewer sites suitable or acceptable by the public for location of power plants. Spanos testified it was "quite possible" that a utility would dismantle a retired plant and build the next generation plant on the same site. Spanos also testified that removal of retired facilities does not benefit future customers and that dismantling should be treated as a cost of service of the plant which should be charged to current customers.

Spanos acknowledged Westar did not provide him with any dismantlement plan for any specific Westar facilities and that Westar had no legal obligation to dismantle nonnuclear facilities. He agreed there are many occasions where a facility is no longer used for generation but is used for some other function rather than being completely dismantled. Spanos testified he had never *personally* documented any occasion where an electric company completely dismantled a power plant in order to construct a new plant on the same land, but he was aware some companies adopted this practice. Finally, Spanos acknowledged Westar's Ripley plant was retired from generation in 1987, but that the facility has never been dismantled by Westar.

Larry Holloway testified on behalf of the Commission's staff regarding Westar's depreciation proposal. Holloway recommended excluding terminal net salvage costs from the depreciation calculations. He testified that absent a legal obligation to dismantle nonnuclear facilities, ratepayers should not be asked to pay for dismantlement. He also indicated that Spanos' calculations were based on unavailable and unspecified case studies and that Spanos' cost estimates for a number of individual plants were flawed. Holloway also testified that if the use of terminal net salvage depreciation was permitted, it should be kept in a special fund and revisited periodically so that returns on the accrued funds would be used to cover part of the future costs. This "sinking fund" model is how Westar handles revenues it receives for decommissioning costs of the Wolf Creek nuclear plant. According to Holloway, using a sinking fund model would reduce Westar's revenue requirement by $7 million annually.

Michael Majoros testified on behalf of KIC, USD 259, and CURB on the depreciation issue. Majoros noted that depreciation was one of Westar's largest operating expenses. According to Majoros, the inclusion of dismantlement costs in current rates produces more depreciation expense than necessary to return the cost of a company's capital asset over the life of the plant. Majoros conducted a survey of steam generating facilities in other states, which indicated that 71 out of 86 units were not dismantled upon retirement. Because dismantling nonnuclear plants is not manda-

tory and is not currently planned by Westar for any facility, Majoros referred to Spanos' cost estimates as "fiction."

Majoros especially objected to Spanos' application of an inflation adjustment to the depreciation cost. According to Majoros, even assuming Westar will incur dismantlement costs in the future, the costs should be recovered based on net present value, as nuclear decommissioning costs are calculated. Majoros testified that permitting the potential future costs to be inflated resulted in charging future inflation to current customers. Majoros calculated that Spanos' inflation adjustment nearly tripled the cost of Westar's depreciation as calculated in 2001.

In its order, the Commission adopted Spanos' terminal net salvage depreciation calculations. The Commission also adopted Spanos' depreciation calculations using an inflation adjustment. However, the Commission determined Westar would be required to make detailed showings in *future* rate cases in order to recover costs for terminal net salvage. The future standard was derived from Holloway's testimony. In future cases, the Commission's staff would not recommend the recovery of terminal net salvage costs unless the utility is legally obligated to dismantle the facility or it is shown that dismantling the facility provides economic benefits to the ratepayers. Also, according to the future standard, prior to making any decision to fund terminal net salvage costs, the Commission should determine whether the utility has a reasonable and detailed plan for dismantling a retired facility.

Petitioners strenuously assert the Commission's order permitting Westar to include terminal net salvage depreciation adjusted for inflation was not supported by substantial competent evidence. Petitioners point out there was no concrete evidence that Westar intends to actually dismantle any of its existing plants at any time in the future. According to Petitioners, Spanos' estimates of depreciation costs were based on studies that were never produced at the rate hearing or made available to the parties. Petitioners contend Spanos' inflation adjustment, which nearly tripled the depreciation expense, was not supported by any evidence and was contrary to generally accepted accounting principles.

The court is well aware of its standard of review. The court must acknowledge the Commission has discretion to weigh the evidence presented and to accept or reject testimony, and the court cannot substitute its judgment for the Commission. *Kansas Industrial Consumers v. Kansas Corporation Comm'n,* 30 Kan. App. 2d 332, 344-45, 42 P.3d 110 (2002). Similarly, the court is generally not permitted to determine the persuasiveness of evidence which the Commission may have believed. 30 Kan. App. 2d at 345.

However, " '[r]easoned decisionmaking, in which the rule announced is the rule applied, promotes sound results, and unreasoned decisionmaking the opposite.' [Citation omitted.]" *Home Telephone Co. v. Kansas Corporation Comm'n,* 31 Kan. App. 2d 1102, 1012, 76 P.3d 1071 (2003), *rev. denied* 277 Kan. 923 (2004). Moreover, the broad unrestricted power of the Commission is only held as a constitutional delegation of legislative authority because the availability of judicial review is a guard against arbitrary administrative action. See *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n,* 239 Kan. 483, 495, 720 P.2d 1063 (1986).

Based upon a review of the entire record, we agree the Petitioners have reason to complain about the Commission's order concerning depreciation. There was no concrete evidence before the Commission that Westar ever intended to actually dismantle any of its existing steam generation plants at any time in the future. The evidence indicated the Ripley plant had not been used as a generating facility since 1987, but was still standing. There was no evidence that substantial dismantling had been planned regarding any facility which had even been partially taken out of generation. Despite testimony about Westar's plans to increase generating capacity, none of Westar's witnesses actually testified to any likelihood that the company would dismantle plants in the future and build new plants on the same site.

We are not rejecting the inclusion of terminal net salvage depreciation if and when it is supported by evidence before the Commission. We note the Commission has permitted the use of terminal net salvage depreciation in a prior rate case without any objection by the parties, which included KIC. We also note that regulatory commissions in other states have permitted terminal net

salvage depreciation. However, in order to uphold an order permitting terminal net salvage depreciation, we conclude there must be *some evidence* that the utility has a reasonable and detailed plan to actually dismantle a generating facility upon retirement. Westar presented no evidence of even tentative plans in this case, even after the Commission's staff and the intervenors vociferously objected to the lack of any plans. Instead, Spanos' testimony was based upon case studies from other areas and was completely speculative as to the realities of Westar's operations. Even the specific survey referred to by Majoros indicated that only 15 out of 86 facilities in other states were dismantled upon retirement. However, based on the Commission's order, Westar would be entitled to include terminal net salvage depreciation in 100% of its steam generation facilities.

The Commission essentially acknowledges the problem with its depreciation order by determining that Westar would be required to make detailed showings in *future* rate cases in order to recover costs for terminal net salvage. The future standard was derived from Holloway's testimony, which apparently was rejected by the Commission in *this case* but will be adopted by the Commission in future cases. While it is commendable for the Commission to require a higher standard of evidence in future rate cases, this determination only adds to the arbitrary nature of the Commission's order in this case.

The Commission's adoption of Spanos' depreciation calculations using an inflation adjustment is even more troubling. Although the Commission permitted terminal net salvage depreciation in a prior rate case without objection by the parties, the Commission's prior order did not include the inflation adjustment as calculated by Spanos in this case. Thus, the Commission's order represented a departure from prior policy without an explanation by the Commission for doing so. See *Western Resources, Inc. v. Kansas Corporation Comm'n,* 30 Kan. App. 2d 348, Syl. ¶ 7, 42 P.3d 162, *rev. denied* 274 Kan. 1119 (2002) (when an administrative agency deviates from a policy it had adopted earlier, it must explain the basis for the change). Other than Spanos' conclusory testimony, there was no evidence before the Commission to support the adop-

tion of the inflation adjustment in calculating depreciation costs. Holloway and Majoros testified in considerable detail that the inflation adjustment was improper under the circumstances and resulted in charging future inflation to current customers. According to Majoros' testimony, Spanos' inflation adjustment nearly tripled the cost of Westar's depreciation as determined in 2001.

Determining an appropriate depreciation expense is a complex issue in any rate case and inherently involves "speculation" to the degree it requires projection of future events. See *Western Resources, Inc.*, 30 Kan. App. 2d at 368-73. However, the need to project future events is not license for the Commission to engage in unchecked speculation. The effect of the Commission's order turns on its head the general principle that changes in rates due to future or nontest year events be, at least to some degree, known and measurable. See *Kansas Industrial Consumers*, 30 Kan. App. 2d at 343. The underlying assumption of the Commission's decision is that Westar will likely significantly dismantle all or most of its steam generation facilities at the end of their operating life. The Commission then multiplies the effect of this assumption by applying an inflation factor. There is no evidence in the record that comparable utilities dismantle or plan to dismantle most or all of their steam facilities. Likewise, the Commission relied on no evidence that Westar had even *tentative* plans to significantly dismantle any of its facilities. The cumulative effect of this lack of evidence renders the Commission's order " ' "so wide of the mark as to be outside the realm of fair debate. [Citations omitted.]" ' " *Williams Natural Gas Co. v. Kansas Corporation Comm'n*, 22 Kan. App. 2d 326, 335, 916 P.2d 52, *rev. denied* 260 Kan. 1002 (1996). Based upon a review of the entire record, we conclude the Commission's order permitting Westar to include terminal net salvage depreciation adjusted for inflation for all of its steam generation facilities was not supported by substantial competent evidence and must be reversed.

### Assessment of Expenses

Finally, Petitioners contend the Commission erred by permitting Westar to assess all of its rate case expenses associated with this

proceeding to the ratepayers. Petitioners assert Westar presented no testimony that its expenses were reasonable and there was evidence that at least some of the expenses were unreasonable. Finally, Petitioners contend at least a portion of the rate case expenses should have been allocated to shareholders because shareholders benefitted from the rate proceeding.

The Commission found that all prudent rate case expenses including attorney fees should be assessed to ratepayers and amortized over a 5-year period as proposed by the Commission's staff. The staff's recommendation had been to permit approximately $3 million in rate case expenses, with $351,000 annually allowed as an expense to Westar North and $271,000 annually allowed as an expense to Westar South.

The general rule is that prudently incurred rate case expenses are among the reasonably necessary expenses that a public utility is entitled to recover in a rate-making proceeding. *Home Telephone Co.*, 31 Kan. App. 2d at 1015. The Commission must weigh competing policies in determining the recovery of appropriate rate case expenses. "Rate case expenditures involve some degree of management choice and discretion whether to incur the expenses." 31 Kan. App. 2d at 1015 (citing *Citizens Utility Board v. ICC*, 166 Ill. 2d 111, 129-30, 651 N.E.2d 1089 [1995].)

Petitioners first contend the Commission permitted Westar to recover imprudent or unnecessary expenses. They contend Westar did not present any witnesses to testify their expenses were reasonable. However, Kevin Kongs, from Westar, testified about rate case expenses and calculated them based on expenses allowed in the last rate case with some increases due to increases in consulting fees. In addition, Mary Jo Struttman, an auditor with the Commission, testified she reviewed Westar's rate case expenses and recommended an adjustment based on the expenses allowed in Westar's last rate case and proposed the expenses be amortized over a 5-year period and subject to a true-up adjustment at the conclusion of the case. She audited the consulting expense and all other facets of rate case expenses and determined they were prudent.

The only testimony Petitioners cite challenging the rate case expenses was the cross-examination of William Seelye, a cost-of-service witness. During his cross-examination, KIC's attorney asked about several unspecified figures on KIC's Exhibit 29 listing five entries including several dinners and lunches as expenses. The questions only challenged specific expenses totaling $322.03. Petitioners cite to no other testimony to support their assertion the rate case expenses were imprudent or unreasonable.

A district court is an expert in the area of attorney fees and can draw on and apply its own knowledge and expertise in determining their value. *Davis v. Miller*, 269 Kan. 732, 750, 7 P.3d 1223 (2000). However, when reviewing an agency's determination of appropriate attorney fees, the court is limited to determining if there was substantial evidence to support the agency's findings. Conflicting evidence or other findings are to be disregarded. *Brewer v. Schalansky*, 278 Kan. 734, 747, 102 P.3d 1145 (2004). Here there was ample evidence to support the agency's findings as to the amount of rate case expenses.

Petitioners also contend that shareholders have benefitted from the rate case proceedings and, therefore, a portion of the rate case expenses should be allocated to them and excluded from the expenses allowed. Petitioners cite to no legal authority for the proposition that rate case expenses are the type of expenses that should be allocated between ratepayers and shareholders. It appears quite clear that the Commission's practice has been to assess all *prudent* rate case expenses as expenses included in the rates. These expenses are generally amortized over several years. See, *e.g., Home Telephone Co.*, 31 Kan. App. 2d at 1015; *Columbus Telephone Co. v. Kansas Corporation Comm'n*, 31 Kan. App. 2d 828, 835-36, 75 P.3d 257 (2003); *Gas Service Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 623, 637-38, 609 P.2d 1157, *rev. denied* 228 Kan. 806 (1980). Petitioners have cited no compelling evidence or legal authorities that justify reversing the Commission's order concerning the rate case expenses.

In summary, we conclude the Commission's order permitting Westar to include a TDC in its rates, under the circumstances of this case, violated K.S.A. 66-117 and K.S.A. 2005 Supp. 66-1237.

We also conclude the Commission's order permitting Westar to include terminal net salvage depreciation adjusted for inflation was not supported by substantial competent evidence. These orders are reversed and remanded for further consideration by the Commission. The balance of the Commission's orders are affirmed.

Affirmed in part, reversed in part, and remanded.